The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
January 23, 2020

**2020COA12**

**No. 19CA0439, *People in Interest of S.R.N.J-S.* — Juvenile
Court — Dependency and Neglect — Termination of the Parent-
Child Legal Relationship — Criteria for Termination**

In this termination of parental rights case, a division of the
court of appeals clarifies that the termination of parental rights
statute, section 19-3-604(1)(c), C.R.S. 2019, requires a finding that
a parent is unfit to terminate parental rights, and not "semi-fit" as
the juvenile court found here. It further clarifies that without a
parental unfitness finding supported by the evidence, the need for
permanency is not enough to terminate parental rights.

Because the court's findings of evidentiary facts are separate
from the court's fitness conclusion and the evidentiary facts here
are clearly erroneous and do not support a conclusion that the

parents were unfit, the division concludes that the juvenile court

erred in terminating the parents' parental rights.

COLORADO COURT OF APPEALS                                2020COA12

Court of Appeals No. 19CA0439
City and County of Denver Juvenile Court No. 17JV1077
Honorable Laurie A. Clark, Judge

The People of the State of Colorado,

Appellee,

In the Interest of S.R.N.J-S. and M.A.J-S., Children,

and Concerning A.N.J-S. and J.A.G.,

Appellants.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE DUNN
Webb and Lipinsky, JJ., concur

Announced January 23, 2020

Kristin M. Bronson, City Attorney, Laura Grzetic Eibsen, Assistant City
Attorney, Denver, Colorado, for Appellee

Barry Meinster, Guardian Ad Litem

The Law Office of Michael Kovaka, Michael Kovaka, Littleton, Colorado, for
Appellant A.N.J-S.

Pamela K. Streng, Office of Respondent Parents' Counsel, Georgetown,
Colorado, for Appellant J.A.G.

¶ 1     Father, J.A.G., and mother, A.N.J-S., appeal the juvenile

court's judgment terminating their parent-child legal relationships

with their children, S.R.N.J-S. and M.A.J-S.  Because the evidence

doesn't support the juvenile court's conclusion that the parents

were unfit, we must reverse and remand the case.

I.     Background

¶ 2     This is the family's second dependency and neglect

proceeding.  In the first case, the Denver Department of Human

Services removed the children, a twin boy and girl, shortly after

their births because mother was using controlled substances.  The

case was closed a year later, and the Department returned the

children to mother.  Father was living in Mexico and visited the

children sporadically.

¶ 3     The Department initiated this case in July 2017 due to

mother's possible methamphetamine use and reported domestic

violence and abuse.  The juvenile court adjudicated the then-

three-year-old twins dependent or neglected and entered treatment

plans for the parents.

¶ 4     Father was still living in Mexico when the Department filed the

case.  Although the Department served him with notice of the

1

proceeding, father did not contact the Department until March 2018, when he began relocating to Colorado.

¶ 5       Two weeks after father made his first court appearance, the children's guardian ad litem (GAL) moved to terminate the parents' parental rights.  In an uncommon turn, the Department opposed the motion and moved, instead, to increase parenting time and transition the children home.

¶ 6       The juvenile court held a twelve-day hearing on the competing motions between August 2018 and February 2019.  At the end of the hearing, the court granted the GAL's motion and terminated both parents' parental rights.

## II.       Termination of Parental Rights

¶ 7       The goal of a dependency and neglect case is to preserve the parent-child relationship whenever possible.  *People in Interest of C.A.K.*, 652 P.2d 603, 610 (Colo. 1982).  And given that the termination of the parent-child legal relationship affects a parent's fundamental liberty interest in the care and custody of the child, the state must exercise extreme caution in terminating parental rights.  *K.D. v. People*, 139 P.3d 695, 700 (Colo. 2006).  For this reason, a juvenile court must strictly comply with the statutory

2

termination criteria. *Id.*; *People in Interest of L.M.*, 2018 COA 57M, ¶ 18.

¶ 8    To terminate parental rights, a juvenile court must find, by clear and convincing evidence, that (1) a child was adjudicated dependent and neglected; (2) the parent didn't comply with an appropriate, court-approved treatment plan or the plan wasn't successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2019.  The burden of proof lies with the party seeking termination. *People in Interest of S.N-V.*, 300 P.3d 911, 914 (Colo. App. 2011) (the due process requirements for a termination hearing place no duty on a respondent parent).

¶ 9    An unfit parent is one whose conduct or condition renders the parent unable to give a child reasonable parental care. § 19-3-604(2).  Reasonable parental care requires, at a minimum, that the parent provide nurturing and protection adequate to meet the child's physical, emotional, and mental health needs. *Id.*; *accord L.M.*, ¶ 28.

## A. Standard of Review

¶ 10 "Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts." *L.M.*, ¶ 17. We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they have record support. *Id.*; *see also People in Interest of S.N. v. S.N.*, 2014 CO 64, ¶ 21. But we review de novo the juvenile court's legal conclusions based on those facts. *People in Interest of S.K.*, 2019 COA 36, ¶ 41; *L.M.*, ¶ 17.

¶ 11 Whether the evidence establishes that a parent is unfit is ultimately a legal conclusion because its resolution requires application of the evidentiary facts to the termination statute. *See* § 19-3-604; *S.N.*, ¶ 21; *see also People in Interest of A.J.L.*, 243 P.3d 244, 246 (Colo. 2010) (evidence supported the juvenile court's factual "findings and its legal conclusion that [parent was] unfit").

¶ 12 Because we review de novo the court's legal conclusions, we need not consider mother's proposal that we conduct an "independent appellate review" of the juvenile court's termination order.

## B. The Oral and Written Termination Orders

¶ 13　At the end of the termination hearing, the juvenile court issued a detailed oral order terminating the parents' parental rights. Later, it issued a short written termination order that contained little detail. What's problematic for our purposes is that the oral parental fitness findings are different from those in the written order.

¶ 14　Specifically, in its oral termination order, the juvenile court found the parents' "conduct or condition [was] semi-fit at this time[,] that they can provide reasonable parental care for the children[,] and additional time will likely not change the conduct or condition within a reasonable period of time."[1] Despite the suggestion of parental fitness, and without further explanation as to fitness, the court terminated father's and mother's parental rights.

¶ 15　Shortly after the hearing, the court issued its written termination order, which recited the parties' names, the date it entered its oral ruling, and the required statutory findings.

---

[1] Reading the termination order as a whole, it seems this sentence contains a typographical error and the court intended to say the parents "cannot" provide reasonable parental care. But even assuming such error, it doesn't affect our analysis.

Regarding fitness, the written order merely stated the parents "are unfit[] as parents for the minor children." But it doesn't explain how or why the court went from "semi-fit" in its oral termination order to "unfit" in its written one.

¶ 16 Generally, a written order controls over a conflicting oral ruling. *People in Interest of T.B.*, 2019 COA 89, ¶ 56 n.1 (Webb, J., dissenting). Here, however, the written order contained no facts specific to this case (other than basic identification and procedural facts). And the court noted in the written order that its oral ruling "more explicitly detailed" the court's findings and those "FINDINGS AND ORDER[] ARE HEREIN INCORPORATED BY REFERENCE."

¶ 17 So, to the extent the oral order controls, for a couple of reasons we conclude it's insufficient to support terminating parental rights. First, beyond being somewhere between fit and unfit, we don't know what "semi-fit" means. Second, even if "semi-fit" has some generally accepted meaning, "semi-fitness" is not a basis upon which to terminate parental rights under section 19-3-604(1)(c)(II). Rather, to terminate parental rights, a court must find by clear and convincing evidence that a parent is unfit. *See* § 19-3-604(1)(c)(II); *see also People in Interest of M.M.*, 215 P.3d

1237, 1252 (Colo. App. 2009). The oral termination order therefore lacks the necessary unfitness finding required to terminate the parents' parental rights.

¶ 18    Given the parental unfitness findings in the written termination order, we next consider whether clear and convincing evidence supports those findings.

### C.    Father's Parental Fitness

¶ 19    At the termination hearing, the caseworker testified that she (1) believed father can provide reasonable parental care; (2) had no concerns about father's ability to meet the children's needs; and (3) agreed father is willing to provide for the reasonable needs of the children. She concluded that, in her expert opinion, father "is a fit and appropriate parent" for the children and termination of father's parental rights wasn't in the children's best interests. Father's visitation supervisor agreed that father could meet the children's needs.

¶ 20    Though contending the juvenile court correctly found father unfit, the GAL points us to no record evidence supporting a different assessment of father's parental fitness. Nor did we find any witness who testified father was unfit.

¶ 21    Despite this seemingly uncontradicted evidence that father was fit and could provide reasonable parental care for the children, we recognize that the juvenile court made some oral findings that addressed father's fitness, including that father (1) had "not used the assistance and services provided to establish a parental relationship with his children where he can care for them and meet their needs on a full-time basis"; (2) "refused to take an active part in raising these children"; (3) "struggle[s] to visit the children once per week, [and] is unable to find the time in his week to visit more often"; and (4) "disputes the encouragement from the professionals on this case."

¶ 22    We therefore examine whether clear and convincing evidence supports these findings, and, if so, whether the findings support the conclusion father was unfit.

### 1.    Parental Relationship

¶ 23    We are unable to find record support for the court's finding that father refused assistance, declined to participate in services, or lacked a parental relationship with the children.  Rather, the visitation supervisor testified that father consistently exhibited strong parenting skills, was attuned to the children's needs, and

8

appeared to have a secure, strong bond with them. And the supervisor believed that reunification could be achieved in a reasonable time and would provide the children the permanency they needed. The visitation supervisor also stated that father had "consistently remained open to feedback, suggestion, and collaboration."

### 2. Participation and Visitation

¶ 24    Nor do we agree that the record established that father didn't actively participate in raising the children, and to the extent the court found that father struggled to visit them, we can't agree that the few missed visits were sufficient to establish by clear and convincing evidence that father failed to provide reasonable parental care for the children. *See L.M.*, ¶ 17.

¶ 25    To be sure, father visited the children infrequently before the case began and did not visit them during the first year of the case. But the evidence showed that once he relocated to Colorado, father actively engaged in the case, exhibited good parenting skills, communicated regularly with the children's therapist and other professionals, and otherwise complied with his treatment plan.

¶ 26    While father only had one visit per week, the GAL opposed the Department's recommendations to increase visitation (seeking termination instead) and the juvenile court declined requests to increase visits.  Despite the failed efforts to increase father's visits, the caseworker and the visitation supervisor testified that father's visits went well and that father provided for the children during the visits.

¶ 27    And we can't agree that father's work schedule, which, at times, limited his availability for visits, rendered him legally unfit.  True, as the juvenile court found, the record shows father had to cancel some visits because he had to work and was not able to make up all the visits due to his work schedule.  But father's visitation supervisor attributed the difficulty in scheduling make-up dates to the foster parents' schedule, father's schedule, and other circumstances.

¶ 28    We recognize that father had a demanding work schedule, but nothing we see in the record — and the GAL points us to nothing — shows that the few missed visits impacted father's treatment plan compliance, his ability to meet the children's reasonable needs, or his demonstrated success in parenting the children.  What's more,

we imagine that most (perhaps all) working parents face similar scheduling conflicts at one time or another. Grappling with such conflicts doesn't, on its own, make them legally unfit.

### 3. Encouragement

¶ 29 Last, we find no record support for the finding that father "dispute[d] . . . encouragement from the professionals on this case." To the contrary, the children's therapist testified that father was receptive to information even when it was difficult to hear. And the visitation supervisor testified that father took feedback well and used suggestions from the children's therapist in visitation.

¶ 30 In sum, under these circumstances, we conclude that the juvenile court's findings that bear on father's fitness lack record support and are clearly erroneous. To the extent the record supports the juvenile court's findings regarding the missed visits, we can't conclude that this evidence standing alone established father's unfitness by clear and convincing evidence.

### D. Mother's Parental Fitness

¶ 31 When asked about mother, the caseworker opined that "[mother] is a fit and stable parent" and "is willing to provide" the

children reasonable parental care.  Explaining the basis for this opinion, the caseworker testified that

- mother "exhibited every objective in her treatment" and had demonstrated that "she's able to implement [these] services in her parenting practices";

- as evidenced through her visitations, mother can parent the children, "meet the children's needs," "redirect the children" as needed, and "appropriately engage with [the] children"; and

- mother and the children have a bond.

¶ 32 The caseworker further opined that it was not in the children's best interests to terminate mother's parental rights.

¶ 33 The caseworker was not alone in her assessment.  Other providers who had observed mother with the children testified that (1) mother and the children are bonded and attached to each other; (2) mother provides for the children's physical and emotional needs; and (3) the visits improved over the course of the case, which could be attributed to mother's "consistency in parenting."

¶ 34 Again, the GAL points us to no witness who opined that mother was unfit.  Nor are we able to find one.

¶ 35    Still, we again look to the juvenile court's detailed oral findings to assess the sufficiency of its conclusion in its written order that mother was unfit. These findings appear to center on mother's noncompliance with her treatment plan. Given that such noncompliance may be considered in determining parental fitness, *see People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008), we turn to these findings.

¶ 36    The purpose of a treatment plan is to help a parent overcome the problems that led the Department to intervene. *C.A.K.*, 652 P.2d at 610. To address the Department's concerns here (substance use, domestic violence, and abuse), mother's treatment plan required her to (1) complete substance abuse and mental health treatment; (2) enhance and maintain family bonding and ties; (3) maintain safe and stable housing; (4) cooperate with the caseworker, GAL, and treating professionals; and (5) support herself and the children financially.

¶ 37    The juvenile court found, with record support, that mother successfully completed substance abuse treatment and mental health treatment. For the remaining objectives, the court found that mother was "partially successful," but ultimately concluded

13

that the treatment plan was unsuccessful. So, we consider the evidence related to these treatment plan components, but again conclude that the evidence didn't support the court's conclusion that mother was unfit.

### 1. Enhance and Maintain Family Bonding and Ties

¶ 38 The juvenile court recognized that mother had attended most of her visits during the past year, arriving early and prepared. Yet the court found that mother was "partially successful" in this objective because of the following:

- The son did not go to mother for comfort as recently as three months before the court entered its order.

- The son had bathroom accidents while visiting with mother, but not with father.

- Both children had emotional setbacks when mother became agitated around the bathroom accidents.

- Mother's fourth visitation supervisor testified that the son's attachment with mother was ambivalent but improving.

¶ 39 But despite the court's identified concerns, our review of the record shows that by all accounts the treatment plan had done what it was supposed to; that is, it improved mother's bonding and

14

ties with the children. And a treatment plan is successful if "it corrects *or improves* the original conduct or condition which led to intervention by the state." *People in Interest of C.L.I.*, 710 P.2d 1183, 1185 (Colo. App. 1985) (emphasis added).

¶ 40    In this regard, the caseworker explained that mother's visits had been very positive, and she had shown at these visits that "she can meet the children's needs[,] [t]hat she can redirect the children[, and] [t]hat she knows how to appropriately engage with the children." And the caseworker testified that mother had "successfully completed [this] objective . . . of the treatment plan."

¶ 41    As well, mother's visitation supervisors generally described mother implementing parenting techniques with her children that she had learned through treatment. Importantly, the fourth visitation supervisor (the most recent one) testified that there had been steady improvement in the son's relationship with mother, explaining that the son had recently sought mother out for play activities, was listening better to her directions, and was accepting and seeking her affection. The visitation supervisor also said in December 2018 that there had been no bathroom accidents for two months.

¶ 42    And we were unable to find any evidence that mother became agitated in response to bathroom accidents. To the contrary, mother's fourth visitation supervisor testified that mother tended to the son's needs when he had an accident; she did not yell, raise her voice, or shame him; and she gave him the choice of whether to clean himself or have her clean him.

¶ 43    Nor did the fourth visitation supervisor testify that the son had an ambivalent attachment to mother. Instead, he stated that, in comparison with the daughter, the son had "a degree of ambivalence" toward mother. But as the visitation supervisor explained in conjunction with this statement, their relationship was improving.

¶ 44    True, the children's therapist attributed some of the children's struggles to their visits with mother. The therapist, however, admittedly never observed any visits between mother and her children. What's more, when the children's therapist testified a second time in February 2019 (shortly before the court's termination order), she declined to opine that termination of mother's parental rights was in the children's best interests.

## 2. Maintain a Safe, Stable, and Suitable Home

¶ 45    In concluding that mother was "partially successful" in maintaining safe, stable, and suitable housing, the juvenile court noted that mother had a lifetime housing voucher and had secured a suitable home for the children. Still, the court was "reluctant to make a finding by clear and convincing evidence that [m]other ha[d] been successful on this component" of her treatment plan because mother had forfeited a lifetime housing voucher in the past, had lived in the home less than four weeks, and had lived in thirteen residences in the past five years.

¶ 46    Despite mother's past struggles with permanent housing, the evidence was undisputed that by the end of the termination hearing mother had obtained the safe, stable, and suitable housing her treatment plan required. Indeed, the caseworker confirmed the housing was suitable, safe, and "very appropriate." Discounting this evidence by requiring mother to somehow overcome evidence of her past housing struggles and show that they would not affect the housing she had secured suggests the court shifted the burden to mother to show compliance with the housing objective, rather than requiring the GAL to prove that mother had *not* reasonably

complied with it. *See S.N-V.,* 300 P.3d at 914; *see also* § 19-3-604(1)(c)(I). In this respect, the juvenile court erred.

### 3. Cooperation

¶ 47 The juvenile court next found that mother was "partially compliant" in cooperating with the caseworker, GAL, and treating professionals. It explained that mother completely engaged with those providers aligned with her but resisted others she perceived as not being aligned with her. The latter category, the court found, included the Court Appointed Special Advocate (CASA), the GAL, the children's therapist, and mother's second visitation supervisor. But the evidence doesn't support these findings.

¶ 48 To start, a CASA is not a caseworker, GAL, or treating professional, so it is unclear whether mother's treatment plan objective applied to the CASA. In any event, the CASA testified that mother had been very responsive once she engaged in her treatment plan and that mother's progress had been tremendous and commendable. True, the CASA said mother had not replied to three recent messages, but the CASA thought that was because the termination proceeding had begun. She gave no indication that mother resisted her or thought she was not aligned with mother.

¶ 49   We likewise are unable to find any testimony or evidence from the termination hearing to support the court's finding that mother resisted the GAL.

¶ 50   As well, the children's therapist testified in September 2018 that mother regularly contacted her to discuss the children's symptoms and progress in therapy. And in February 2019, she testified that mother always appeared receptive to information and continued to contact her regularly after the termination proceedings began. She explained that when she and mother had trouble connecting by telephone, they still communicated by text message. The testimony also showed that, throughout the case, mother followed through on homework the therapist assigned, used the techniques she suggested, continued to be receptive to suggestions, and had fruitful discussions with the therapist.

¶ 51   And, finally, mother's second visitation supervisor testified to a single negative interaction in one of the three visits she supervised. The visitation supervisor testified that, at that visit, she interrupted mother to provide therapeutic intervention — an approach mother had never experienced in nineteen previous visits at the agency, including two with this supervisor — without first explaining the

new protocol. According to the supervisor, (1) mother told her not to interrupt and that they could talk afterward; (2) the visitation supervisor continued to intervene; and (3) mother became verbally disrespectful and combative, so the supervisor ended the visit.[2] Even so, this single visit occurred approximately eight months before the order terminating parental rights and reflected an event neither repeated nor reported again by any other visitation supervisor or mother's caseworker.

¶ 52 Except for this single interaction with mother's second visitation supervisor, the record contains no evidence that mother did not cooperate with (or resisted working with) the professionals in her case or that she perceived any professional as not aligned with her. And given the evidence that mother complied with her treatment plan and was fit, we can't agree that a single negative interaction with one visitation supervisor established by clear and convincing evidence that mother was unfit.

---

[2] We recognize that another agency employee contradicted the supervisor's account of mother's conduct, but it was the juvenile court's prerogative to resolve this evidentiary conflict.

#### 4. Financially Support Herself and the Children

¶ 53 The treatment plan required mother to maintain a legal source of income, ensure that the children's material needs were met, and provide proof of income to the Department.

¶ 54 The juvenile court acknowledged that mother had "been employed for most of this case" but again found that she was only partially successful in this treatment plan component. It explained that mother had been unemployed for one three-week period during the case, had many short-term periods of employment, and had changed jobs in the past six months.

¶ 55 But, as the evidence showed, mother was employed at the completion of the termination hearing and no evidence suggested that her employment was temporary or otherwise unstable. The caseworker confirmed that mother had provided proof of employment and testified that mother had successfully complied with this objective.

¶ 56 We therefore see nothing in the record showing that mother was unable to financially support herself and the children or that she failed to comply with this component of the treatment plan.

21

¶ 57    In sum, after reviewing the record, we conclude that (1) many of the court's findings on mother's compliance with her treatment plan are clearly erroneous and (2) the few findings that are supported by the record do not support the juvenile court's conclusion that the GAL proved by clear and convincing evidence that mother was unfit.

### III.    The Children's Need for Permanency

¶ 58    All that said, we understand the juvenile court's legitimate concern for the children's need for permanency and stability. The children's therapist testified that the children had struggled with the lack of consistency, and the caseworker agreed that the children needed stability and permanency. Indeed, by the age of four, the children had changed homes and caregivers four times.

¶ 59    Juvenile courts must give primary consideration to the child's physical, mental, and emotional conditions and needs when considering termination. § 19-3-604(3). And a determination of parental fitness is intertwined with a determination of the child's best interests. *K.D.*, 139 P.3d at 700; *see also People in Interest of E.A.*, 638 P.2d 278, 285 (Colo. 1981). But a parent may not be deemed unfit simply to improve the child's condition. *E.A.*, 638

P.2d at 285; *L.M.*, ¶ 29; *accord Northland v. Starr*, 581 N.W.2d 210, 213 (Iowa Ct. App. 1998) (possible destructive emotional injury of removing four-year-old child from stepfather's home after mother's death did not outweigh the long-term benefit of shifting custody to fit father).

¶ 60 Given that the evidence didn't support a finding that the parents were unfit, the need for permanency alone wasn't sufficient to terminate the parents' constitutional interest in the care and the custody of their children. § 19-3-604(1)(c); *L.M.*, ¶ 29; *see also Stanley v. Illinois*, 405 U.S. 645, 657-58 (1972) (state has no interest in separating children from custody of fit parents); *cf. People in Interest of M.D.*, 2014 COA 121, ¶ 43 (in contrast to termination of parental rights, section 19-3-702(4), C.R.S. 2019, allows a juvenile court to award permanent custody to a nonparent without finding parental unfitness in some circumstances).

## IV. Conclusion

¶ 61 The judgment is reversed, and the case is remanded to the juvenile court.

JUDGE WEBB and JUDGE LIPINSKY concur.

23