24CA0401 Peo in Interest of AE 09-05-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0401
Douglas County District Court No. 21JV113
Honorable H. Clay Hurst, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of A.E., G.E., C.C., and S.M., Children,

and Concerning S.C.,

Appellant.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE YUN
Dunn and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 5, 2024

---

Jeffrey A. Garcia, County Attorney, Angela Bain, Assistant County Attorney, Castle Rock, Colorado, for Appellee

Josi McCauley, Guardian ad Litem, for A.E. and G.E.

Debra W. Dodd, Counsel for Youth, Berthoud, Colorado, for C.C.

Josi McCauley, Counsel for Youth, Superior, Colorado, for S.M.

Ainsley Bochniak, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1     In this dependency and neglect action, S.C. (mother) appeals the judgment terminating her parent-child legal relationships with A.E., G.E., C.C., and S.M.  We affirm.

## I.     Background

¶ 2     The Douglas County Department of Human Services (the Department) filed a petition in dependency and neglect, alleging that mother's physical abuse, neglect, substance use, and "extreme mental health concerns" were negatively impacting A.E., G.E., and C.C.  The petition also alleged that the family had three prior dependency cases.

¶ 3     The Department amended the petition two months later when it learned that although S.M. was living full-time with her father, she was concerned about being forced to return to her mother's care and wanted protective orders to include her.  While the case was open, House Bill 22-1038 took effect and C.C. and S.M. were appointed direct-representation counsel for youth.  *See* Ch. 92, secs. 1-37, 2022 Colo. Sess. Laws 430-47.  A.E. and G.E. continued to be represented by their guardian ad litem (GAL).

¶ 4     The juvenile court adjudicated the children dependent and neglected and adopted a treatment plan for mother.  More than one

year after the petition was filed, mother began participating in the case. She engaged in her mental health treatment and began reintegration therapy. She participated in services for about six months.

¶ 5    Two years after the petition was filed, the Department and GAL for A.E. and G.E. moved for termination of mother's parental rights to all of the children. Around the same time, the court suspended mother's family time. Six months later and following a hearing, the court granted the termination motion.

## II.    Termination of Parental Rights

¶ 6    The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2024; *People in Interest of E.S.*, 2021 COA 79, ¶ 10.

¶ 7    Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law. *People in Interest of*

2

*A.M. v. T.M.*, 2021 CO 14, ¶ 15. "We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they have record support." *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. It is for the juvenile court, as the trier of fact, to determine the sufficiency, probative effect, and weight of the evidence and to assess witness credibility. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010). But we review de novo the juvenile court's legal conclusions based on those facts. *See S.R.N.J-S.*, ¶ 10. In particular, the ultimate determination of whether the Department provided reasonable efforts is a legal conclusion we review de novo. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

## A. Reasonable Efforts

¶ 8 Mother contends that the juvenile court erred by finding that the Department provided reasonable efforts. She argues that the Department failed to assist her in identifying and engaging providers for her mental health and to facilitate communication with and between various providers. She also contends that the court erred by making her responsible for providing releases of information and "allow[ing] the department to deny [family time]

3

until mother did so."  We consider, and reject, each contention in turn.

## 1.    Applicable Law

¶ 9    The Department must make reasonable efforts to rehabilitate parents and reunite families following the out-of-home placement of abused or neglected children.  §§ 19-1-103(114), 19-3-100.5, 19-3-604(2)(h), C.R.S. 2024.  "Reasonable efforts" means "the exercise of diligence and care" to reunify parents with their children.  § 19-1-103(114).

¶ 10    To that end, services that are provided in accordance with section 19-3-208, C.R.S. 2024, are deemed to satisfy the reasonable efforts standard.  § 19-1-103(114).  To evaluate whether a department made reasonable efforts, the court should consider whether the provided services were appropriate to support the parent's treatment plan.  *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011).

¶ 11    The parent is ultimately responsible for using the provided services to obtain the assistance needed to comply with the treatment plan.  *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).  A court may therefore consider a parent's

4

unwillingness to participate in treatment when determining whether a department made reasonable efforts. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12.

## 2. Preservation

¶ 12 The Department and GAL argue that we should not consider mother's reasonable efforts claim because it was not raised before or at the termination hearing. Mother states that she preserved this issue by generally objecting to the termination of her parental rights and by asserting in her closing argument that "the Department had failed to adequately assist [her] in addressing her mental health concerns" and "failed to facilitate [her] participation in therapeutic visitation."

¶ 13 Divisions of this court are split on whether a failure to make a specific objection to reasonable efforts bars consideration of the issue on appeal. *Compare People in Interest of D.P.*, 160 P.3d 351, 355-56 (Colo. App. 2007) (holding that a parent must bring any deficiencies in a department's provision of reasonable efforts to the court's attention before a termination hearing), *with S.N-V.*, 300 P.3d at 916 (holding a parent's failure to raise reasonable

efforts concerns before termination does not bar appellate review of a reasonable efforts claim).

¶ 14     We need not resolve this question because, even if assume that mother preserved the issue for appellate review, we conclude that the juvenile court did not err by finding that the Department provided reasonable efforts.

### 3.     Mental Health Services

¶ 15     Mother contends that the Department failed to (1) assist her "in identifying and engaging providers"; (2) facilitate her reengagement with her previous mental health provider; and (3) facilitate communication between professionals as part of its reasonable efforts obligation.

¶ 16     The juvenile court found that the Department made reasonable efforts to provide mother with services that were provided in her treatment plan. However, the court found that these efforts "have unfortunately been unable to rehabilitate [mother]," as she "lacked engagement in her treatment" and continued to struggle with the same problems that led to the dependency and neglect action.

¶ 17     The record supports these findings.  The Department's caseworker testified that mother had made only "minimal steps to engage in her treatment."  Although there were periods when mother met with her mental health provider, "she believed . . . that she had completed her program" and, as a result, stopped meeting with the provider or taking her mental health medication.  The Department made referrals for multiple services but focused on mother's mental health as the priority, based on the suggestion of mother's multidisciplinary treatment team.  Notably, at the termination hearing, mother argued that the dependency and neglect action should remain open longer because her mental health concerns would be best addressed through competency restoration at the state hospital in Pueblo — not through any services that could or should be provided by the Department.

¶ 18     Although section 19-3-208 does not require a Department to "assist" or "facilitate" a parent's participation in services as mother claims, the record demonstrates that in this case the Department did just that.  The caseworker participated in a "Care Compact Team" with mother's mental health provider and probation; they met regularly with the goal of supporting mother's mental health

7

and other needs. The caseworker was also in contact with mother's providers outside of the "Care Compact Team," providing them with updated contact information for mother and general updates about mother's status.

¶ 19 The caseworker also made efforts to facilitate communication between mother's mental health provider and the reintegration therapist but was thwarted by mother, who told the reintegration therapist that "there was no reason for them to speak" because "she was no longer required to complete [mental health] therapy." The caseworker further tried to meet regularly with mother and encourage her to reengage with her mental health provider, but mother reported that she did not trust her team and stopped meeting with her mental health provider completely more than five months before the termination hearing.

¶ 20 The record therefore supports the juvenile court's determination that it was mother's refusal to participate, and not the Department's lack of efforts, that prevented her from successfully addressing her mental health concerns.

### 4. Family Time

¶ 21 Mother also contends that the court erred by making her responsible for providing releases of information and "allow[ing] the department to deny [family time] until mother did so."

¶ 22 The Department moved to restrict mother's parenting time about a month before filing for termination and eight months before the termination hearing. After a contested hearing, the juvenile court granted the motion. As part of that ruling, the court found that mother's individual therapist needed to be involved as "the stopgap between harm to the children." To that end, the court ordered that therapeutic reintegration could only safely continue once mother signed a release for her mental health provider to communicate with the therapeutic reintegration provider.

¶ 23 As part of the termination judgment, the juvenile court found that mother failed to maintain family time contact with the children "despite the department's reasonable efforts and willingness to provide those services." The court found that the Department "tried to address the safety concerns as to mother and there is nothing more they could have done."

¶ 24     The record supports these findings.  After the court restricted mother's family time, the caseworker continued to meet with the therapeutic reintegration provider.  The caseworker contacted the provider regularly and made referrals to make sure services were "set up and ready for whenever [mother] wanted to participate"  At first, mother refused to sign releases and then told the therapeutic reintegration provider "there was no reason for them to speak" to her individual provider.  Mother did eventually sign releases, but communication issues continued between mother's individual therapist and the therapeutic reintegration provider.  The Department offered to make referrals to other providers but could not do so until mother was in contact with the caseworker.  But mother would not meet with the caseworker for the last five months of the dependency and neglect action.

¶ 25     At the termination hearing, mother conceded that her participation in therapeutic family time was hampered not by the Department but by her own lack of mental health stability.  Mother admitted that she was not able to reengage with the children in therapeutic family time until she addressed her mental health.

¶ 26    Given this record, we perceive no error in the juvenile court's determination that the Department provided reasonable efforts.

## B.    Less Drastic Alternative

¶ 27    Mother contends that the juvenile court erred by finding that there were no less drastic alternatives to termination for the children.  In particular, she asserts that the court could have given her more time to demonstrate compliance with the treatment plan. We discern no basis for reversal.

### 1.    Applicable Law

¶ 28    The juvenile court must consider and eliminate less drastic alternatives before entering a judgment terminating the parent-child legal relationship under section 19–3–604(1)(c).  *People in Interest of L.M.*, 2018 COA 57M, ¶ 24.  In considering less drastic alternatives, the court bases its decision on the best interests of the child, giving primary consideration to the child's physical, mental, and emotional conditions and needs.  § 19-3-604(3).  Permanent placement is not a viable less drastic alternative if the child needs a stable, permanent home that can only be assured by adoption.  *People in Interest of Z.P.,* 167 P.3d 211, 214 (Colo. App. 2007).

11

¶ 29    Giving a parent more time to comply with a treatment plan may be a less drastic alternative in some circumstances.  *See* § 19-3-604(1)(c)(II) (including a finding that a parent is unlikely to become fit within a reasonable time as a criterion for termination). "In determining whether a parent's conduct or condition is likely to change within a reasonable time, the court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition."  *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24.

¶ 30    What constitutes a reasonable time is fact specific and must be determined by considering the physical, mental, and emotional conditions and needs of each individual child.  *Id.* at ¶ 25; *see People in Interest of D.L.C.*, 70 P.3d 584, 588 (Colo. App. 2003) ("A parent may be unfit as to one, but not all, of his or her children."). A "reasonable time" is not an indefinite time.  *S.Z.S.*, ¶ 25.  And even when a parent has made recent progress on a treatment plan, the court is not required to give the parent additional time to comply.  *See id.* at ¶¶ 24-25.

¶ 31    A juvenile court may terminate one parent's rights under the Children's Code while leaving the other parent's rights intact.

*People in Interest of J.L.M.*, 143 P.3d 1125, 1127 (Colo. App. 2006); *see also* §§ 19-3-601 to -612, C.R.S. 2024. In determining whether less drastic alternatives to termination exist, the court may recognize differences between a child's parents, as well as differences between sibling children, and base its decision upon the best interests of each of the children. *J.L.M.*, 143 P.3d at 1127.

### 2.    All of the Children

¶ 32    The juvenile court found that there was no less drastic alternative that served the best interests of any of the children based on "the circumstances, the posture of this case, and the needs of the children." The court found that, over the two and a half years the case was open, good cause existed to extend timeframes to give mother more time to engage in treatment. However, the court also noted that "a reasonable time is not indefinite" and found that "no additional amount of time [was] reasonable." The court found that mother "refused to appear and participate" in the hearing, and she also failed to engage in treatment for her mental health and substance abuse and continued to engage in criminal activity. The court found that, despite efforts in this and the earlier dependency and neglect cases,

mother did not reasonably comply "with significant aspects of the court ordered treatment plan," including maintaining family time through reintegration therapy with the children.

¶ 33    The record supports these findings. Despite multiple suggestions from the juvenile court, mother refused transport from the county jail to the courthouse that would have allowed her to participate in the termination hearing. The court took judicial notice of mother's multiple dependency and neglect cases and her pending criminal cases, including a criminal child abuse charge.

¶ 34    The caseworker, who was qualified as an expert in casework and child protection, testified that mother took only "minimal steps to engage in her treatment plan" and had not seen the children in the year before the termination hearing. The caseworker opined that mother was "not in a place mentally or physically . . . where she [could] care for the children." The caseworker testified that the termination of mother's parental rights was necessary to ensure that the children would not come back into the Department's care again.

¶ 35    Furthermore, the caseworker opined that mother's conduct or condition was not likely to change in a reasonable period of time.

The caseworker testified that the case was open for two and a half years and there had "only been short periods where [mother] was coherent enough and stable enough to be able to even see the children, let alone parent them effectively." The caseworker testified that "a reasonable amount of time for these children should have passed in a prior case . . . at this point we are three cases in." The caseworker opined there was "no reasonable expectation" that mother would be able to reunify with any of the children within a reasonable time.

### 3. S.M.

¶ 36     Because the juvenile court found that mother abandoned S.M. pursuant to section 19-3-604(1)(a), it was not required to consider less drastic alternatives. *See L.M.*, ¶ 24. Even so, the court considered and ruled out less drastic alternatives to termination for S.M. The court found that "her desire as a youth in transition can only be achieved through termination of her mother's parental rights and making her available for a stepparent adoption."

¶ 37     The record supports these findings. S.M. was fifteen years old at the termination hearing and testified on her own behalf. S.M. asked the court to terminate mother's parental rights so she could

be adopted by her stepmother. At the time of the termination hearing, S.M. was living with her father and stepmother and had not seen her mother for almost three years. The caseworker testified that S.M. was consistent in her position and that the Department agreed it was in S.M.'s best interests for mother's parental rights to be terminated to allow for the stepparent adoption to proceed.

### 4. C.C.

¶ 38 The juvenile court found that there was no less drastic alternative to termination available that would be in C.C.'s best interests given his needs and the circumstances of the case. The court considered alternatives, including giving mother more time, and rejected those options because C.C. was in a permanent placement that wanted to adopt him, and appropriate permanency could only be achieved through adoption. The court found that "no additional amount of time" for mother to comply would be reasonable.

¶ 39 The record supports these findings. C.C. was almost thirteen years old at the termination hearing. C.C. advocated for the termination of mother's parental rights and asserted that

appropriate permanency for him could only be achieved through adoption by his long-time placement providers. The caseworker testified that C.C. was diagnosed with ADHD, oppositional defiance disorder, and PTSD that required his caregivers to work with multiple professionals to ensure that his needs would be met. The caseworker testified that C.C. consistently maintained that he wanted mother's parental rights to be terminated so he could be adopted by his placement providers. The caseworker also opined that C.C. needed a stable and permanent home that could only be ensured through termination and adoption.

### 5. A.E. and G.E.

¶ 40 The juvenile court considered less drastic alternatives to termination for A.E. and G.E. and found there were none based on the children's needs and the overall circumstances in the case. The court found it was in their best interests to move the case forward to permanency by terminating mother's parental rights.

¶ 41 The record supports these findings. At the time of the termination hearing, A.E. was nine years old and had struggled to control her behavior. She was diagnosed with reactive attachment disorder. G.E., who was ten years old at the termination hearing,

tended to "revert back to being very young whenever [she was] dysregulated in any way." Both children participated in regular mental health treatment to address their trauma. While A.E. and G.E. reported they would like to maintain contact with their biological family, both children asked to be adopted by their placement providers.

¶ 42 Still, mother argues that she should be given more time to comply with her treatment plan because the Department and GAL were not seeking termination of A.E. and G.E.'s father's parental rights. The court found that A.E. and G.E.'s father was not fit at the time of the hearing and that the children were in a permanent placement that wanted to adopt them if their father remained unfit. The court found that, short of their father becoming fit within a reasonable period of time, their permanency could only be achieved through adoption.

¶ 43 The record further supports the juvenile court's findings. The caseworker opined it was in the children's best interests to terminate mother's parental rights while giving A.E. and G.E.'s father more time. The caseworker testified that mother and A.E. and G.E.'s father were differently situated. Unlike mother, A.E. and

G.E.'s father was participating in treatment and making progress toward the treatment plan goals. The caseworker testified that A.E. and G.E. were in a "back and forth type environment" with mother throughout the case, not knowing if they would see her, and struggled with mother's mental health status and how it affected them.

¶ 44 For all these reasons, the juvenile did not err by finding that there were no less drastic alternatives to termination.

### III. Disposition

¶ 45 The judgment is affirmed.

JUDGE DUNN and JUDGE MOULTRIE concur.