25CA2167 Peo in Interest of TAR 06-25-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA2167
City and County of Denver Juvenile Court No. 23JV30576
Honorable Laurie Clark, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of T.A.R., a Child,

and Concerning M.D.M. a/k/a M.D.R-M. and C.B.G.,

Appellants.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE SULLIVAN
Pawar and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 25, 2026

---

Miko Brown, City Attorney, Amy J. Packer, Assistant City Attorney, Denver, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant M.D.M. a/k/a M.D.R-M.

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant C.B.G.

¶ 1     In this dependency and neglect proceeding, C.B.G. (father) and M.D.M. a/k/a M.D.R-M. (mother) appeal the judgment terminating their parent-child legal relationships with T.A.R. (the child). We affirm.

## I.     Background

¶ 2     When the child was born in December 2022, she tested positive for opiates. As a result, the parents began working voluntarily with Denver Human Services (the Department) and agreed to a safety plan.

¶ 3     About seven months later, the Department received a report that the child had ingested fentanyl while in the care of a family friend. The parents took the child to the emergency room, where the medical professionals determined that she had overdosed. They revived her by using Narcan. The parents agreed to another safety plan that prohibited them from unsupervised contact with the child and identified a family member to care for the child when she was released from the hospital. But less than a week later, both parents were arrested after law enforcement found fentanyl in their car during a traffic stop. And the family member who had been

identified to care for the child told the Department that she was no longer willing to do so.

¶ 4 Consequently, the Department filed a petition in dependency and neglect alleging concerns about the parents' substance use and involvement in the criminal justice system. The juvenile court granted temporary legal custody of the child to the Department, which placed the child in foster care.

¶ 5 Mother admitted the allegations in the petition, and the juvenile court adjudicated the child dependent or neglected relating to mother. The court then adopted a treatment plan that required mother to address her substance use issues and develop a safe and supportive relationship with the child.

¶ 6 Thereafter, genetic testing revealed that father wasn't the biological father of the child. Nonetheless, at father's request, the juvenile court held a hearing and adjudicated father to be the child's legal father. Father then admitted the allegations in the petition, and the court adjudicated the child dependent or neglected relating to father. The court adopted a treatment plan that required father to address his substance use issues, refrain from engaging in

criminal activity, and develop a safe and supportive relationship with the child.

¶ 7　　In March 2025, the guardian ad litem (GAL) moved to terminate the parents' legal relationships with the child. Shortly thereafter, the juvenile court granted the Department's motion to amend father's treatment plan to add additional requirements related to his mental health. The court also granted the Department's motion to heighten father's family time supervision from monitored to fully supervised based on concerns that (1) the child was returning from family time with "burst blood vessels," which indicated "excessive crying for hours at a time," and (2) the child had become more dysregulated when father's family time supervision level had decreased. Around the same time, based on a recent diagnosis of autism spectrum disorder, father requested accommodations under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213.

¶ 8　　About four months later, the juvenile court held a seven-day termination hearing. Approximately two years after the Department filed the petition in dependency and neglect, the court granted the GAL's termination motion.

## II.     GAL's Standing to Move for Termination

¶ 9     As a threshold matter, both parents contend that the GAL lacked standing to file the motion to terminate their parental rights. We disagree.

¶ 10     Both the supreme court and divisions of this court have held that a GAL may move to terminate the parent-child legal relationship. *C.W.B. v. A.S.*, 2018 CO 8, ¶ 24; *A.M. v. A.C.*, 2013 CO 16, ¶ 14; *People in Interest of C.N.T.*, 2026 COA 47, ¶ 15; *People in Interest of M.N.*, 950 P.2d 674, 676 (Colo. App. 1997). These decisions are consistent with a GAL's broad statutory authority to, among other things, make "recommendations to the court concerning the child's welfare" and participate in the proceedings "to the degree necessary to adequately represent the child." § 19-3-203(5), C.R.S. 2025; *see also M.N.*, 950 P.2d at 675 (a GAL's motion to terminate the parent-child legal relationship is "no more than a recommendation or request to the court").

¶ 11     The parents nonetheless rely on *People in Interest of R.M.P.*, 2025 CO 34, to argue against the GAL's standing. In *R.M.P.*, the supreme court reiterated the longstanding principle that "[t]he State is the exclusive party entitled to bring an action in dependency and

neglect." *Id.* at ¶ 33 (quoting *C.W.B.*, ¶ 22).  As a result, a GAL can't "initiate or prosecute a dependency and neglect petition against the child's parents."  *Id.* at ¶ 22.

¶ 12    A division of this court recently interpreted *R.M.P.* narrowly as addressing "only the State's authority to (1) initiate a case and (2) prosecute the petition to its conclusion — a dependency and neglect adjudication."  *C.N.T.*, ¶ 10.  According to the *C.N.T.* division, "*R.M.P.* says nothing about whether, after an adjudication is entered, a GAL can file a motion to terminate."  *Id.* at ¶ 12.  The division therefore rejected the argument that a GAL lacks standing to move for termination of the parent-child legal relationship.  *Id.* at ¶ 15.

¶ 13    We agree with the division's analysis in *C.N.T.* and perceive no reason to depart from it here.  Had the supreme court in *R.M.P.* intended to overrule its prior holdings recognizing a GAL's authority to move to terminate parental rights, *see C.W.B.*, ¶ 24; *A.M.*, ¶ 14, it would have done so expressly, not *sub silentio*.

¶ 14    Accordingly, we reject the parents' argument that the GAL lacked standing to move for termination of their parental rights.

### III. Termination of Parental Rights

¶ 15 Both parents argue that the juvenile court erred by terminating their parental rights. Specifically, father challenges the court's findings that he was unfit and that he couldn't become fit within a reasonable time. Mother challenges the court's finding that no less drastic alternatives to termination existed. We aren't persuaded by either parent.

### A. Legal Framework and Standard of Review

¶ 16 The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent hasn't complied with an appropriate, court-approved treatment plan or the plan hasn't been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 17 Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. Thus, we review the court's factual findings for clear error but review de novo its legal conclusions based on those facts. *Id.*

6

## B. Finding of Father's Unfitness

¶ 18 Father contends that the juvenile court erred by finding that he was unfit because the record showed that he complied with every aspect of his treatment plan and demonstrated that he was capable of providing a safe and stable home for the child. We discern no error.

### 1. Applicable Law

¶ 19 A parent is unfit if their conduct or condition renders them unable or unwilling to give a child reasonable parental care. *S.R.N.J-S.*, ¶ 9. "Reasonable parental care requires, at a minimum, that the parent provide nurturing and protection adequate to meet the child's physical, emotional, and mental health needs." *Id.*

¶ 20 While a treatment plan must be reasonably calculated to render a parent fit to provide adequate parenting to their child, *see* § 19-1-103(12), C.R.S. 2025, a parent's partial or even substantial compliance with the treatment plan may not be sufficient to render the parent fit, *see People in Interest of T.E.M.*, 124 P.3d 905, 909 (Colo. App. 2005).

7

## 2. Analysis

¶ 21 The juvenile court found that although father substantially complied with his treatment plan, he "ha[d] not internalized the services provided in such a way to address the child protection concerns" that brought the family to the Department's attention. Specifically, the court found that father was unable to "safely parent [the child] with her high level of needs." It further found that father struggled to understand the child's needs or the impact of trauma from the child's perspective, and that such understanding was necessary to care for the child, particularly when she was dysregulated. The court also found that father's mental health impacted him on a daily basis, which affected his ability to parent the child. The court noted that some of father's mental health triggers were "exactly the behaviors the minor child displays when she is feeling most dysregulated," which it found concerning because father "may need to regulate himself" in those moments instead of helping the child regulate. The court ultimately concluded that father's conduct or condition rendered him unfit.

¶ 22 The record supports the juvenile court's findings. In terms of the child's "high level of needs," the child's pediatrician and her

8

child-parent psychotherapy (CPP) therapist testified that the child had severe sleep issues, episodes of extreme dysregulation, and regressive behaviors. Both providers also testified that the child's issues and behaviors weren't typical of children her age. The CPP therapist was "gravely concerned" about the child because her symptoms were the "most acute" the therapist or her team had ever seen. Similarly, the pediatrician had "maybe seen one other child" who had symptoms of the "same intensity."

¶ 23    To that end, the pediatrician testified that the child wasn't getting enough sleep because she took a "really long time" to fall asleep and experienced night terrors, which frequently interrupted her sleep. The pediatrician noted that although the child needed twelve to sixteen hours of sleep every night, she was only sleeping for two hours on some nights, and her sleep was interrupted "almost every night." The pediatrician expressed concern about the child's lack of sleep because "poor sleep is associated with both short-term and long-term health consequences," such as mental illness, obesity, behavioral difficulties, poor school performance, and developmental delays.

¶ 24    The CPP therapist testified that the child regularly experienced "sudden onset dysregulatory episodes where she los[t] physical control of her body" and engaged in aggression toward herself and others.  During those episodes, the child screamed, thrashed, banged her head, hit, and kicked.  The CPP therapist further testified that the child "disassociate[d] on a regular basis" and had recently experienced extreme "regression in toileting behaviors."

¶ 25    The CPP therapist, who testified as an expert in infant mental health with an emphasis on trauma and attachment, opined that the child needed a stable, consistent caregiver who could understand her high level of needs and co-regulate with her during episodes of dysregulation.  The child's occupational therapist and pediatrician reiterated the same things.  Based on her work with father, however, the CPP therapist didn't believe that he fully understood the child's needs or that he had the ability to co-regulate with the child in the way that she needed.  The CPP therapist testified that despite father's consistent attendance and engagement with CPP, he hadn't made any sustained progress in viewing the child's trauma and behaviors from the child's perspective.  The CPP therapist testified that while father made

10

some progress during each session, the progress didn't carry over to the next session. Without such progress, father hadn't moved past the foundational stage of CPP, meaning he hadn't engaged in any joint therapy sessions with the child.

¶ 26 The CPP therapist also testified that father's mental health issues, specifically his post-traumatic stress disorder, hindered his ability to meet the child's needs. The CPP therapist noted that "the first step to helping a young child regulate is regulating yourself." But father had told the CPP therapist that the child's feelings of distress were overwhelming and distressing to him, which made co-regulation "even harder." Indeed, father testified that some of his triggers aligned "exactly" with the child's behaviors when she became dysregulated. And father's individual therapist testified that she had concerns about father being able to consistently and safely manage his mental health while caring for the child.

¶ 27 Moreover, the caseworker testified that the Department moved to restrict father's family time from monitored visits to supervised visits approximately four months before the termination hearing because it was concerned about father's mental health. In support of its concerns, the Department referenced numerous reports it had

received of marks and bruises on the child that seemed to correlate with father's family time. The caseworker confirmed that the child's marks and bruises decreased significantly when father's family time became supervised again. The caseworker also testified that the Department objected to father's request for overnight visits with the child approximately one month before the termination hearing. And, despite testifying that father was fit, the caseworker didn't believe that the child could be returned to him immediately.

¶ 28    On appeal, father argues that the juvenile court erred by finding him unfit because (1) the evidence showed that he had substantially complied with his treatment plan; (2) the caseworker opined that he was fit; (3) the family time supervisor testified that father met the child's needs during family time; and (4) the parent-child interactional evaluator opined that the child was bonded and attached to him. But the juvenile court heard all that evidence and still found father unfit. And we can't reweigh the evidence. *See People in Interest of K.L.W.*, 2021 COA 56, ¶ 62; *see also In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15 (when the record supports the trial court's findings, its resolution of conflicting evidence is binding on review); *In re*

*Marriage of Hatton*, 160 P.3d 326, 329 (Colo. App. 2007) (an appellate court may presume that the trial court considered all admitted evidence).

¶ 29    While we recognize that father made great strides in complying with his treatment plan, the record shows that the court properly considered the evidence supporting father's compliance, weighed it against the contrary evidence and the needs of the child, and determined that father was unfit because he couldn't meet the child's needs.  Because the record supports the court's findings, we decline to disturb them on appeal.

### C.    Father's Fitness Within a Reasonable Time

¶ 30    Father also contends that the juvenile court erred by finding that he couldn't become fit within a reasonable time.  He asserts that he "maintained a loving and bonded relationship with the child" and "made consistent and substantial progress on his treatment plan from the outset of the case."  We discern no error.

### 1.    Applicable Law

¶ 31    A parent must have a reasonable amount of time to work on a treatment plan before the juvenile court terminates their parental rights.  *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App.

13

2007).  The determination of a reasonable period is necessarily fact specific; thus, what constitutes a reasonable time to comply with a treatment plan may vary from case to case.  *Id.*  In determining whether a parent can become fit in a reasonable time, the juvenile court may consider whether any change has occurred during the pendency of the proceeding.  *In Interest of K.D.*, 139 P.3d 695, 700 (Colo. 2006).  A reasonable time isn't an indefinite time, and it must be determined by considering the physical, mental, and emotional conditions and needs of the child.  *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24.

¶ 32    Additionally, when a child is under six years old, the juvenile court must consider the expedited permanency planning provisions, which require that the child be placed in a permanent home as expeditiously as possible.  *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025.

2.    Analysis

¶ 33    The juvenile court considered whether father could become fit within a reasonable amount of time but ultimately concluded he couldn't.  The court noted that because of the child's "young age" and "high need for permanency," it prioritized expedited placement.

14

The court found that the child needed a caregiver who was attuned to her needs and could provide a high level of support "right now." The court also found that the child couldn't wait for "the mere possibility of a successful transition" to father and that any delay in permanency would be "physically, emotionally, and developmentally" detrimental to the child. The court concluded that despite the Department's reasonable efforts and accommodations for father, he couldn't "become rehabilitated . . . in a reasonable amount of time as it pertain[ed] to [the child] and her need for permanency," especially when considering "the severity of her behaviors and regressions."

¶ 34    The record supports these findings. By the time of termination, the child had been in foster care for over two years. A year and a half had passed since the court adopted father's initial treatment plan, and six months had passed since the court adopted his amended treatment plan. But, as discussed above, the juvenile court found that father hadn't mitigated the court's concerns about his inability to meet the child's significant needs.

¶ 35    As an expert in infant mental health, the CPP therapist opined that children need permanency, consistency, and stability to grow

and develop. The CPP therapist further opined that, from a psychological perspective, the child was "out of time" and couldn't wait for permanency because her symptoms were "growing more intense by the day." The therapist explained that the child struggled with unpredictability and changes to routine and that every transition between the foster parents and father was triggering and traumatic for the child. According to the CPP therapist, the child couldn't heal from her trauma if she remained in the current "impermanent" situation.

¶ 36 In addition, the CPP therapist doubted that father could meet the child's needs in the timeline that the child needed. She explained that father had made "very minim[al] sustained progress" in the eight or nine months that he had been working with the CPP therapist.

¶ 37 As father points out, the caseworker, who testified as an expert in social casework with an emphasis in child protection, opined that the child could transition to father's care in approximately two months. Contrary to that testimony, the juvenile court found that the caseworker "believe[d] a transition home could happen within [six] to [twelve] months" and that the child couldn't

16

wait that long. Thus, we agree with father that this specific finding was clearly erroneous because no evidence or testimony supported it. *See People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15 (a trial court's factual finding is clearly erroneous if it has no record support).

¶ 38    But we disagree that this error requires reversal. Ample evidence supports the court's ultimate finding that father couldn't become fit within a reasonable time. In particular, the court relied heavily on the CPP therapist's opinion, and the therapist repeatedly stated that the child was already "out of time" and that any further delay in permanency would be detrimental to her. Thus, even if the court had accurately quoted the caseworker's testimony that a transition home could occur within two months, nothing in the record suggests that the court would have found that father could become fit within a reasonable time or that it would have ultimately denied the GAL's motion to terminate father's parental rights. *See* C.A.R. 35(c) (we may "disregard any error or defect not affecting the substantial rights of the parties"); *People in Interest of R.J.*, 2019 COA 109, ¶ 22 (an error affects a substantial right only if it can be

said with fair assurance that it substantially influenced the case's outcome or impaired the basic fairness of the trial itself).

¶ 39 To the extent that father argues that his strong bond with the child demanded that he be permitted more time to demonstrate his fitness, we disagree. As already discussed, the juvenile court heard testimony about father's bond with the child. But the court still found, based on the child's high needs, that any further delay in permanency wouldn't be in her best interests. That finding was supported by the record. And we can't reweigh the evidence. *See K.L.W.*, ¶ 62; *B.R.D.*, ¶ 15; *Hatton*, 160 P.3d at 329.

¶ 40 Finally, to the extent that father argues that the juvenile court should have allowed more time for the Department to provide the ADA accommodations he requested, we conclude that his argument is undeveloped. True, father requested ADA accommodations about six months before the court terminated his parental rights. But on appeal, father doesn't identify any specific services or accommodations that were lacking during the six months leading up to termination. Nor does he explain how more services or accommodations would have rendered him fit within a reasonable time, particularly in light of the juvenile court's extensive findings

about the child's immediate need for permanency. Given this, we decline to address father's ADA argument. *See People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004) (declining to address an appellate contention that lacked supporting facts and specific arguments).

¶ 41 Accordingly, we conclude that the juvenile court properly analyzed whether father could become fit within a reasonable time. And because the court's findings are supported by the record, we decline to disturb its determination.

### D. Less Drastic Alternatives

¶ 42 Last, mother contends that the juvenile court erred by determining that there were no less drastic alternatives to termination. Specifically, she argues that, assuming the juvenile court erred by terminating father's parental rights, an allocation of parental responsibilities to father was a viable less drastic alternative.

¶ 43 But mother concedes that she doesn't have standing to challenge the propriety of the juvenile court's termination of father's parental rights. *See People in Interest of J.A.S.,* 160 P.3d 257, 261 (Colo. App. 2007). And she acknowledges that her argument is

19

premised on our reversal of the juvenile court's order terminating father's parental rights. Because we have affirmed the juvenile court's termination of father's parental rights, we necessarily reject mother's argument.

## IV.  Disposition

¶ 44  We affirm the judgment.

JUDGE PAWAR and JUDGE MEIRINK concur.