24CA0914 Peo in Interest of GWT 11-21-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0914
Adams County District Court No. 22JV112
Honorable Emily Lieberman, Judge

The People of the State of Colorado,

Appellee,

In the Interest of G.W.T., L.W.T., and C.W.T., Children,

And Concerning S.R.M.,

Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE BROWN
Welling and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 21, 2024

Heidi Miller, County Attorney, Deborah Kershner, Assistant County Attorney, Westminster, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant

¶ 1    In this dependency and neglect action, S.R.M. (mother) appeals the judgment terminating her parent-child legal relationships with G.W.T., L.W.T., and C.W.T. (the children).  We affirm.

## I.    Background

¶ 2    The Adams County Human Services Department (the Department) filed a petition in dependency and neglect, alleging concerns about the children's exposure to domestic violence and substances, resulting in their basic needs not being met.  The petition also alleged that the family had prior involvement with the Department, including one court-involved and two voluntary cases.  The juvenile court adjudicated the children dependent and neglected and adopted a treatment plan for mother.

¶ 3    Eight months after the petition was filed, the Department moved to terminate mother's parental rights.  Over the next year, the termination hearing was continued and reset at least five times.  Almost two years after the petition was filed, the juvenile court terminated mother's parental rights after a contested hearing.[1]

---

[1] The children's father confessed the motion to terminate parental rights and is not a party to this appeal.

## II. Fit Within a Reasonable Time

¶ 4     Mother contends that the juvenile court erred by finding she could not become fit within a reasonable time. We are not persuaded.

### A. Standard of Review and Applicable Law

¶ 5     The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2024; *People in Interest of E.S.*, 2021 COA 79, ¶ 10.

¶ 6     An unfit parent is one whose conduct or condition renders them "unable or unwilling to give the child reasonable parental care to include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions." § 19-3-604(2). In determining whether a parent's conduct or condition is likely to change within a reasonable time, "the court may consider whether any change has occurred

during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition." *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24.

¶ 7 What constitutes a reasonable time is fact specific and must be determined by considering the physical, mental, and emotional conditions and needs of each child. *Id.* at ¶ 25. A "reasonable time" is not an indefinite time. *Id.* And even when a parent has made recent progress on a treatment plan, the court is not required to give the parent additional time to comply. *See id.* at ¶¶ 24-25. When, as here, a child is under six years old at the time the petition is filed, the action is subject to the expedited permanency planning provisions, and the court must consider the child's need to be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, C.R.S. 2024.

¶ 8 Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. "We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they

3

have record support." *People in Interest of S.R.N.J-S.*, 2020 COA 12,
¶ 10. We review de novo the juvenile court's legal conclusions. *See
id.*; *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

¶ 9    It is for the juvenile court, as the trier of fact, to determine the
sufficiency, probative effect, and weight of the evidence and to
assess witness credibility. *People in Interest of A.J.L.*, 243 P.3d 244,
249-50 (Colo. 2010).

## B. Analysis

¶ 10    The juvenile court determined that mother was unfit based on
her "long standing" substance dependence, domestic violence, and
mental health concerns. The court found that mother was "either
unwilling or unable to address the protective concerns that gave
rise to this matter."

¶ 11    The juvenile court also determined that mother could not
become fit within a reasonable time because "these children cannot
wait any longer for permanency." The court found that although
"there may have been enough to proceed to termination much
earlier in the case," mother was given "a considerable extension of
time to work on . . . compliance with the treatment plan" but did
not take advantage of the extensions given to her. The court noted

that "we are two years in and . . . there is no indication that [mother] is at a place where she is ready or willing to do [the] trauma work" needed so the children could be returned home. The court found that mother had not addressed the concerns that kept her from safely parenting and that "[u]nder no reasonable circumstances can the welfare of the children be served by a continuation of the parent-child legal relationship."

¶ 12 Mother contends that the juvenile court erred because (1) she complied with much of her treatment plan; (2) her prior involvement with the Department led to reunification; and (3) allowing her more time would not delay her children's needs for permanency because they were not in potentially permanent homes. We consider, and reject, each contention in turn.

### 1. Compliance with the Treatment Plan

¶ 13 The record supports mother's assertion that she complied with portions of her treatment plan, which included objectives requiring mother to engage in life skills services, apply for housing and employment, address issues of domestic violence, stabilize her mental health, address substance dependence, maintain and strengthen her bond with the children, comply with probation, and

refrain from further criminal activity. The caseworker testified that mother obtained housing with the assistance of a municipal court caseworker and resolved one of her probation cases. Mother also began treatment with at least three different providers to address substance dependence, domestic violence, and mental health concerns.

¶ 14　But the record does not support mother's other claims — specifically that she stayed in communication with the Department, engaged in intensive outpatient services through probation, provided clean drug screens, and addressed her substance dependence concerns. The caseworker testified that mother's communication with her was "intermittent." There was no evidence that mother stayed engaged in any intensive outpatient services. The caseworker testified that mother was not compliant with her substance testing through probation. Although mother reported recent participation in a new treatment program, the caseworker was unable to learn anything about the program even after connecting with the program's self-identified "CEO." That person told the caseworker that mother was providing clean UAs, but they did not respond to the caseworker's request for copies of the

6

results, so the caseworker did not have any evidence that mother was sober. And the caseworker testified she did not know whether the program satisfied mother's treatment plan requirements because the CEO did not tell her what treatment needs they were addressing with mother or how often.

¶ 15 In any event, the caseworker testified that mother's failure to address the key components of her treatment plan — domestic violence, mental health, and her relationships with the children — continued to raise child protection concerns. While it is true that mother did not have any new domestic violence charges, the caseworker testified that domestic violence concerns had not been mitigated. The caseworker also testified that there were "no behavioral or observable changes" to demonstrate success through any of the treatment programs that mother attempted.

¶ 16 The juvenile court found that these unaddressed concerns, particularly as related to mother's mental health, impacted her fitness and relationship with the children "significantly." The court found that "there are concerns that when [mother] is dysregulated, she becomes emotionally accusatory towards the children and she's unable to meet their needs consistently when she can't consistently

regulate herself." The court found that mother's behaviors during family time were "particularly concerning for these particular children" because of their heightened needs.

¶ 17 The record supports these findings. The caseworker testified that mother was on the "high risk" track for family time because she was unable to regulate during family time and made threats that placed the children, staff, and herself in danger. The "high risk" track required law enforcement or security personnel presence at family time. The caseworker testified that all the children had special needs and generally were "not able to regulate without consistent support, adult intervention, and having more than one adult to support them." The caseworker testified that mother was not able to provide an emotionally safe environment for any of the children.

¶ 18 The family time supervisor testified that she had to intervene in family time multiple times. Although there were times when mother could regulate herself and help the children regulate, other times she blamed the children for the Department's involvement, argued with staff, targeted the children, and contributed to the children's dysregulation. During one notable family time session,

while the children were present, mother argued that she should be able to hit one of the children as a punishment for not listening to her.

¶ 19    The record belies mother's assertion that her mental health concerns were limited to her worries about the impending termination of parental rights hearing. Independent of the Department's involvement, probation saw the need for mental health services and attempted to assist mother with getting an evaluation and treatment, but she did not follow through. Mother's expert at the termination hearing testified that she had significant childhood adversity and that her post-traumatic stress disorder had a "significant effect" on her everyday life. Although mother's expert discussed her trauma responses at some length, he never suggested that mother's reactions were caused by or limited to the stress of the pending termination hearing.

¶ 20    Given this record, we cannot conclude that the juvenile court erred by finding that mother did not successfully comply with her treatment plan so as to render her a fit parent.

## 2. Prior Successful Reunification

¶ 21    The juvenile court acknowledged that mother was a respondent in an earlier dependency and neglect action where she was able to engage and successfully complete her treatment plan. But the court noted that "there was a theme that arose through some of the testimony that [mother] doesn't believe she needs services and everything would be fine if the children were just returned." The court wondered if mother was unwilling to engage with the core elements of her treatment plan because of her "disagreement that this case should have ever been opened."

¶ 22    In any event, mother does not allege that the services provided during this case were deficient or otherwise explain why her earlier successful reunification should have led the court to grant her more time during this case. And as the juvenile court noted, prior dependency and neglect cases, even those resulting in reunification, must be considered in "determining unfitness." § 19-3-604(2)(i).

## 3. Impact of More Time on Permanency

¶ 23    Finally, mother contends that giving her more time would not have delayed the children's permanency. But the juvenile court

found, with record support, that mother had already been given more time to engage with her treatment plan.

¶ 24      Mother had more than a year between when the Department moved for termination and when the court held the hearing. First, *the caseworker* advocated for mother to have more time to work on her treatment plan. The hearing was continued again three months later for the same reason. The hearing was then continued two more times because new counsel was appointed and a final time to allow father to appear in person.

¶ 25      Mother benefitted from each of these continuances, three of which occurred after mother's expert completed an evaluation giving specific recommendations for mother's engagement and success. At termination, the caseworker testified that she previously "asked the county attorney to withdraw her motion [for termination because she] . . . believed [mother] had the capacity to succeed . . . [but] it's been ten months and there's been no progress." As the court found, "it doesn't appear that a whole bunch at all was done" with the extra time given to mother.

¶ 26      The juvenile court also found that "these children cannot wait any longer for permanency." The record supports this finding. The

caseworker testified that she was concerned about the children's mental and emotional health if they "continue[d] to languish in foster care." The caseworker testified that the children were "indicating that they want to know where they're going to be" and opined that the children needed the permanency of adoption. At least one of the children was struggling with attending family time and asked not to be made to go.

¶ 27    Mother contends that because the children were not in permanent placements at the time of termination, their need for permanency was not resolved with the termination of her parental rights. But the record suggests otherwise. The caseworker testified that G.W.T. was in a potentially permanent home and that the other children were going to transition to that home shortly after the termination hearing. The record also suggests that termination of mother's parental rights would make permanent placement of the children more viable.

¶ 28    Furthermore, a child's placement is a different matter than a child's need for permanency. *See A.M.*, ¶ 32 (a less drastic alternative to termination must be rejected when termination is in the child's best interests); *see also People in Interest of T.E.M.*, 124

12

P.3d 905, 910 (Colo. App. 2005) ("[P]ermanent placement with a family member is dependent on the child's best interests, as is the determination whether to order permanent placement as an alternative to termination . . . [which] may not be appropriate when it does not provide adequate permanence or otherwise meet the child's needs.") (citations omitted). This is particularly true when, as was the case here, the juvenile court finds that the statutory criteria for termination have been met, an ongoing relationship with a parent is not beneficial to the children, and termination is in the children's best interests. *See A.M.*, ¶ 36 ("The Children's Code does not support the conclusion that 'a parent-child relationship should be continued when it has been shown by clear and convincing evidence that . . . the parent is unfit, an appropriate treatment plan has been tried without success, and the conduct or condition of the parent is unlikely to change within a reasonable time.'" (quoting *People in Interest of A.M.D.*, 648 P.2d 625, 637-38 (Colo. 1982))).

¶ 29    Thus, we conclude that the juvenile court did not err by declining to grant mother more time to comply with her treatment plan or by concluding that termination was in the children's best

interests even though they may not have been in permanent placements.

## III.   Disposition

¶ 30     The judgment is affirmed.

JUDGE WELLING and JUDGE MOULTRIE concur.