24CA1105 Peo in Interest of GDD 02-13-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1105
City and County of Denver Juvenile Court No. 23JV30189
Honorable Lisa M. Gomez, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of G.D.D., a Child,

and Concerning D.C.P and J.D.D.,

Appellants.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE TOW
Dunn and Graham*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 13, 2025

---

Kerry Tipper, City Attorney, Christina R. Kinsella, Assistant City Attorney, Denver, Colorado, for Appellee

Robert G. Tweedell, Guardian Ad Litem

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant D.C.P.

Patrick R. Henson, Office of Respondent Parents' Counsel, Chelsea A. Carr, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant J.D.D.

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     In this dependency and neglect proceeding, D.C.P. (mother) and J.D.D. (father) appeal the juvenile court's judgment terminating their parent-child legal relationships with G.D.D. (the child). We affirm the judgment.

## I.     Background

¶ 2     The Denver Department of Human Services filed a petition in dependency or neglect regarding the newborn child. The petition alleged that mother appeared under the influence at the hospital and admitted using methamphetamine during her pregnancy. The petition further alleged that the child tested positive for amphetamine, methamphetamine, and fentanyl and was diagnosed with congenital syphilis, hydrocephalus, and several other medical conditions requiring intensive care. Father also admitted substance abuse.

¶ 3     The juvenile court accepted the parents' admissions to the allegations of the petition and adjudicated the child dependent and neglected. The court adopted treatment plans for each parent requiring that they, among other things, (1) complete substance abuse evaluations and engage in recommended treatment; (2) attend mental health counseling; (3) maintain stable

1

employment and housing; (4) engage in regular family time; and (5) learn to provide for the child's extensive medical needs.

¶ 4 The Department later moved to terminate the parents' parental rights. After a hearing, the court terminated mother's and father's parent-child legal relationships with the child.

## II. Additional Time

¶ 5 Both parents argue that the juvenile court erroneously found that they could not become fit parents within a reasonable time. We are not persuaded.

### A. Applicable Law and Standard of Review

¶ 6 "Once a treatment plan has been devised for a parent, a court may only terminate parental rights when, among other things, the court finds that parent unfit and unable to become fit in a reasonable time." *People in Interest of L.M.*, 2018 COA 57M, ¶ 27. An unfit parent is one whose conduct or condition renders them "unable or unwilling to give the child reasonable parental care to include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions." § 19-3-604(2). When determining whether a parent's conduct or condition is likely to change within a

2

reasonable time, "the court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition." *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24.

¶ 7    What constitutes a reasonable time is fact specific and must be determined by considering the physical, mental, and emotional conditions and needs of each particular child. *Id.* at ¶ 25. A "reasonable time" is not an indefinite time. *Id.* And even when a parent has made recent progress on a treatment plan, the court is not required to give the parent additional time to comply. *See id.* at ¶¶ 24-25. When, as here, a child is under six years old at the time the petition is filed, the action is subject to the expedited permanency planning (EPP) provisions, and the court must consider the child's need to be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, C.R.S. 2024.

¶ 8    Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. "We review the juvenile court's findings of evidentiary fact — the raw, historical data

3

underlying the controversy — for clear error and accept them if they have record support." *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. We review de novo the juvenile court's legal conclusions. *See id.*; *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

¶ 9 It is for the juvenile court, as the trier of fact, to determine the sufficiency, probative effect, and weight of the evidence and to assess witness credibility. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

## B. Analysis

¶ 10 The juvenile court determined that neither mother nor father could become fit to parent the child in a reasonable time. It found that the case had been open more than a year, and the parents were still struggling with substance abuse, untreated mental health problems, and instability. And the court noted that the child had very high needs. The record supports the court's findings.

¶ 11 Mother admitted to relapsing in January 2024, and, although she provided one negative urine sample in February 2024, she did not consistently submit to drug testing thereafter and was not engaged in substance use treatment at the time of the termination hearing. The caseworker testified that she could not verify any kind

4

of steady employment for mother, although mother had found housing and was scheduled to move in shortly after the termination hearing. The caseworker also testified that mother had not engaged in mental health treatment.

¶ 12 The caseworker testified that father's substance use was the Department's primary concern. Father's substance abuse treatment provider testified that father participated in medically assisted treatment, but did not regularly engage in individual or group therapy and failed to submit regular sobriety tests.

¶ 13 The caseworker also testified that father had been incarcerated for several months during the proceeding but acknowledged that he had reached out to his substance abuse treatment provider the day of his release to start treatment again. However, that day he also provided a urine sample that tested positive for amphetamine and methamphetamine. Moreover, father told the caseworker he did not need to submit to further sobriety testing through the substance abuse treatment provider because he was already required to do so through probation. But father's probation officer testified that father was non-compliant with sobriety testing and was facing sanctions.

¶ 14    With respect to the child's needs, his pediatrician testified about his various medical conditions and ongoing treatment. The child's placement provider testified that the child had extensive medical needs including a shunt placed after he had a stroke at around two weeks old. The child required around the clock monitoring for signs that the shunt was malfunctioning. If the child exhibited symptoms such as fever and vomiting, he had to be immediately transported to the hospital or risk another stroke, grave brain injury, or death. The child's placement provider testified that the child had been admitted to the hospital around seven times since he had been placed with them after leaving the hospital after birth and that those stays lasted from three days to about a week.

¶ 15    The child also regularly saw a host of doctors and specialists to manage his conditions. He attended a center specializing in the care of children with sight problems. He required special thickened formula both for additional calorie intake and because he had trouble with ingesting different textures. And he regularly attended occupational, physical, and speech therapies.

¶ 16    The child's doctor testified that she was "encouraged by . . . all the progress he has made" but that his future outlook was "very challenging." She testified that the child needed continued diligent therapy and follow up with subspecialists and general pediatric doctors as well as "doing the homework" in between therapy sessions and medical appointments. She testified that the child was "high risk" and needed "extra diligence and care." She further testified that a "stable, nurturing home environment . . . ranks in importance" along with his continuation of medical care and therapies.

¶ 17    Although father's testimony expressed an understanding of some of the child's medical needs, he admitted that he and mother had "a lot . . . to get together" before being able to fully care for the child. And he admitted that while he tried to attend visits with the child regularly, there had been "quite a few times" that he was not able to.

¶ 18    Father testified that he and mother needed "two or three months" to be in a place to care for the child and that his biggest obstacle was getting identification and securing employment. But he failed to address the Department's main concern — his

substance abuse. Father's substance abuse treatment provider testified that "it takes a good amount of time and energy and support" for an individual to be able to stop abusing substances.

¶ 19 The caseworker, who testified as an expert in social caseworker with an emphasis in child protection, opined that she did not believe that mother or father could become fit in a reasonable time for the child. She testified that both parents' substance use problems "had gone back for several years," and that she did not know how long it would take for parents to become fit. She testified that they continued to struggle with instability, substance abuse, and mental health problems despite significant resources and time. She also testified that the child's needs were extensive and that she did not believe either parent was aware of all of the child's medical needs and symptoms or would be able to consistently respond appropriately and immediately in an emergency situation. And she opined that "[the child,] given his age and given his needs, deserves the permanency that adoption will provide for him following a termination of . . . parental rights."

¶ 20 On appeal, both parents assert that they had achieved some stability because mother had obtained housing, father had plans to

get himself added to the lease, and that they were cooperative and "very respectful" with the caseworker. But nothing suggests that either parent would be able to fully address their substance abuse or mental health issues within a reasonable time for the child, particularly given his extensive medical needs. *See S.Z.S.*, ¶¶ 24-25 (the court is not required to give additional time even when a parent has made recent progress).

¶ 21 Based on this evidence in the record, and considering the EPP provisions requiring permanency as expeditiously as possible, the juvenile court did not err when it found the parents' conditions unlikely to improve within a reasonable time for the child.

### III. Disposition

¶ 22 We affirm the judgment.

JUDGE DUNN and JUDGE GRAHAM concur.