24CA0975 Peo in Interest of SMMC 12-12-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0975
El Paso County District Court No. 23JV30318
Honorable Lara Yoder Nafziger, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of S.M.M.C., a Child,

and Concerning A.C. and D.C.,

Appellants.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Brown and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 12, 2024

---

Kenneth R. Hodges, County Attorney, Jessica M. Brungardt, Assistant County Attorney, Colorado Springs, Colorado, for Appellee

Jenna L. Mazzucca, Guardian Ad Litem.

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant A.C.

Patrick R. Henson, Office of Respondent Parents' Counsel, Justin Twardowski, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant D.C.

¶ 1     In this dependency and neglect action, A.C. (mother) and D.C. (father) appeal the judgment terminating their parent-child legal relationships with S.M.M.C. (the child).  We affirm.

## I.     Background

¶ 2     The El Paso County Department of Human Services (the Department) filed a petition in dependency and neglect, alleging that the child was born positive for substances and showed signs of withdrawal.  The Department also alleged that mother and father were respondents in four earlier dependency and neglect actions, all ending in termination of their parental rights.

¶ 3     The juvenile court adjudicated the then-newborn child dependent and neglected and adopted treatment plans for mother and father.  Both treatment plans required participation in family time, life skills, and mental health services, and the provision of a safe and sober environment for the child.

¶ 4     Nine months after the petition was filed and after a contested hearing, the juvenile court authorized placement of the child out of state with the paternal uncle and aunt "given the lack of engagement of her parents in this case."  The Department later moved to terminate both parents' parental rights.  More than a year

after the petition was filed, the juvenile court granted the motion following a contested hearing.

## II.    Reasonable Efforts

¶ 5    Mother and father both contend that the juvenile court erred by finding that the Department provided reasonable efforts to rehabilitate them.  We aren't persuaded.

### A.    Applicable Law

¶ 6    Before a court may terminate parental rights under section 19-3-604(1)(c), C.R.S. 2024, it must consider if the county department of human services made reasonable efforts to rehabilitate parents and reunite families.  §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2024.  Reasonable efforts means the "exercise of diligence and care . . . for children and youth who are in foster care or out-of-home placement."  § 19-1-103(114).

¶ 7    Services provided in accordance with section 19-3-208 satisfy the reasonable efforts standard.  § 19-1-103(114).  Among the services required under section 19-3-208 are screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral

services to available public and private assistance resources; family time services; and placement services. § 19-3-208(2)(b).

¶ 8    When evaluating a department's efforts, the juvenile court should consider whether the provided services were appropriate to support the parent's treatment plan. *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). The parent is ultimately responsible for using those services to obtain the assistance needed to comply with the treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).

B.    Standard of Review

¶ 9    Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. "We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they have record support." *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. But we review de novo the juvenile court's legal conclusions based on those facts. *See id.* In particular, the ultimate determination of whether the Department provided reasonable

efforts is a legal conclusion we review de novo. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

¶ 10    It is for the juvenile court, as the trier of fact, to determine the sufficiency, probative effect, and weight of the evidence and to assess witness credibility. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

### C.    Reasonable Efforts to Rehabilitate Mother

¶ 11    The juvenile court found that the Department made reasonable efforts as to mother, including making family time, substance dependence and mental health treatment, and life skills services available to her. The court found that there were "multiple referrals to various providers and [mother] still did not comply" and that there had "simply been an utter lack of engagement for the duration of the case." The court acknowledged that there were periods of time where referrals weren't active for mother's services but found that such gaps were "not a lack of reasonable efforts. You can't put in a referral for somebody who is not engaged in the case."

¶ 12    The record supports these findings. The caseworker testified that the Department made two referrals for substance abuse

4

evaluations, two referrals for mental health evaluations, and two referrals for life skills services. Mother didn't engage in any of these services. The Department made at least four referrals for family time and authorized the child's placement to supervise virtual family time after the child had moved out of state. Mother attended only one in person and two virtual family time sessions.

¶ 13 The caseworker testified that mother didn't respond to providers or the Department for long stretches of time. The Department couldn't reach mother at all between when the child was three months and nine months old. The caseworker testified that caseworkers from the Department called and went to mother's home twice a month to try to initiate contact, but they were unsuccessful in engaging mother. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12 (holding that the court may consider a parent's unwillingness to engage when determining whether a department made reasonable efforts).

¶ 14 The caseworker located mother in custody ten months after the petition was filed. At that time the caseworker arranged virtual family time for mother and made new referrals to providers who could enter the facility to conduct the requisite evaluation. Despite

family time being available, mother participated in only one virtual family time session after she was in custody.

¶ 15 Mother contends that the juvenile "court agreed the Department did not do enough to get visits accomplished for [mother] while the child was in the hospital." The court found that mother "did not abandon [the child] at the hospital. [The Department] did not put in good faith efforts to make sure the parents visited the child while she was in the hospital." But mother doesn't explain why, and the record doesn't suggest, that the court's finding about family time during the child's hospitalization should eclipse the other findings it made, including that mother failed to participate in family time without good cause. The child was held at the hospital for three of the fifty-eight weeks between the child's birth and the termination hearing. Mother's only in-person contact with the child occurred at the hospital, when the child was nine days old.

¶ 16 Mother also contends that the Department failed to provide her with bus passes and a cell phone. The juvenile court ordered the Department to provide mother with a bus pass shortly after the petition was filed. The caseworker testified she wasn't sure the bus

pass was given to mother but said that the Department "usually" provided bus passes when requested. The caseworker also testified she wasn't aware that mother might need a cell phone until mother told her during a visit while mother was in custody at the end of the case. Notes made by earlier caseworkers indicated that mother had communicated with them using her own cell phone at the beginning of the case. The caseworker testified that if mother had expressed a need for a cellphone before she was in custody, the Department would have provided her with one. In any event, providing a cell phone to a parent isn't a service required for reasonable efforts under the Children's Code. § 19-3-208.

¶ 17     Mother further contends that the Department "didn't provide several services identified in section 19-3-208(2)(b)." But mother doesn't identify what further services she believes should have been made available to her. The Department need not provide services that aren't relevant to supporting a parent's treatment plan, and the Department has "discretion to prioritize certain services or resources to address a family's most pressing needs in a way that will assist the family's overall completion of the treatment plan."

*People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33; *see also*

*S.N-V.*, 300 P.3d at 915.

¶ 18     Given this evidence, we can't conclude that the Division failed

to provide reasonable efforts for mother.  Therefore, we won't

disturb the juvenile court's findings and legal conclusions in this

regard.

### D.     Reasonable Efforts to Rehabilitate Father

¶ 19     Father's employment required frequent travel, and the juvenile

court recognized that virtual services were necessary to

accommodate father's work schedule.  The court also found that the

Department "should have put in virtual services earlier,"

particularly for life skills, which father started to engage in two

months before the termination hearing.  Despite this issue, the

court found that overall the Department made reasonable efforts to

rehabilitate father, including providing life skills, metal health, and

family time supervision services.  Importantly, the juvenile court

found that even though the Department made virtual family time

available to father at the beginning of the case, father participated

only three times, and last saw the child ten months before the

termination hearing.  The court found that ten months was "too

long a gap" for this child, in part because she had never been parented by father. The court "specifically d[id] not find good cause for [father] failing to visit" the child.

¶ 20 These findings are supported by the record. The caseworker testified that the Department made four referrals for family time services beginning when the child was released from the hospital. Father testified that virtual family time was available to him from the beginning of the case at his request. Father attended three virtual family time sessions in the first few months of the action and then stopped engaging with family time providers. Father's third and final virtual family time session with the child occurred when the child was only three months old. Father never attended in-person family time with the child, which was also offered to him by the Department. Although father testified that he didn't know about providers assigned to supervise his family time, the juvenile court found his testimony to be not credible.

¶ 21 The record makes clear that father failed to engage in the services that were available to him. The caseworker testified that referrals outside of family time were somewhat delayed by father's objection to services in the treatment plan. Once the treatment

plan was adopted by the court, the Department made multiple referrals for life skills and mental health services. Father didn't complete a mental health evaluation as required by his treatment plan, even though the caseworker kept referrals open and reminded father of the services available to him when she spoke to him. Father did engage with the virtual life skills provider but completed only two sessions in the two months that the referral was active before the termination hearing.

¶ 22    There is no evidence that father would have participated in virtual mental health or life skills services if they were available earlier in the action. And, as the juvenile court noted, "a lot of mental health treatment is being done virtually now," and the Department's failure to specify virtual services in its referral didn't necessarily mean that those services wouldn't have been available to father virtually if he had followed through on the many referrals made by the Department.

¶ 23    We therefore discern no error in the juvenile court's finding that, overall, the Department made reasonable efforts to rehabilitate father. Nor will we disturb the court's conclusions that those efforts

were unsuccessful, and that father remained unfit to parent the child.

### III. Less Drastic Alternatives to Termination

¶ 24 Father and mother contend that the juvenile court erred by finding that there were no less drastic alternatives to termination.

¶ 25 Specifically, father contends that the juvenile court could have given him more time with reasonable efforts in place. Father's contention in this regard rests entirely on his claim that the Department failed to make reasonable efforts — a contention we considered and rejected in Part II.D above. Accordingly, because we rejected father's reasonable efforts claim, we likewise must reject his less drastic alternative claim. Even if this were not the case, the juvenile court found, with record support, that the child could not wait any longer for father to become a fit parent.

¶ 26 Mother asserts that there may have been a less drastic alternative available, but the Department failed to investigate possible placement with her relatives.

¶ 27 The juvenile court must consider and eliminate less drastic alternatives before it terminates the parent-child legal relationship. *People in Interest of L.M.*, 2018 COA 57M, ¶ 24. In considering less

drastic alternatives, the court bases its decision on the best interests of the child, giving primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3). Permanency is a separate inquiry from placement. *See A.M.*, ¶ 37. Ultimately, for a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, the less drastic alternative must be the "best" option for the child. *Id.* at ¶ 27. Therefore, if the court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. And under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

¶ 28    Here, the juvenile court found that the child "cannot wait any longer for permanency." The court noted that the child had never been cared for by her parents, had only "minimal contact" virtually with them, and "simply doesn't know who her biological parents are." The court found that there were no less drastic alternatives to termination available to the child because the child's best interests,

12

"physical, mental, and emotional needs require termination and adoption."

¶ 29    The record supports these findings.  The child was placed with paternal relatives who were also placement providers for her siblings.  The caseworker, an expert in child protection and child welfare, opined that she wouldn't recommend an allocation of parental responsibilities because the child was very young and didn't have any kind of relationship with either parent.  The caseworker considered giving either parent more time to engage but opined that the child couldn't wait and had "waited a long time already to have permanency."  The caseworker opined that termination and adoption was the only permanency option that would meet the child's needs.  *See A.M.*, ¶ 32.

¶ 30    Mother argues that, had the Department explored her relatives, it may have identified a placement that was willing to accept an allocation of parental responsibilities.  But the Department isn't required to "make special inquiry and independently identify and evaluate other possible placements within or outside the family."  *People in Interest of D.B-J.*, 89 P.3d 530, 532 (Colo. App. 2004).  And in any event, the juvenile court

found, with record support, that — regardless of the child's placement provider — the child's permanency required the termination of both parents' parental rights.

¶ 31    Given this record, we discern no error in the juvenile court's determination that there was no less drastic alternative to termination.

## IV.    Disposition

¶ 32    The judgment is affirmed.

JUDGE BROWN and JUDGE MOULTRIE concur.