24CA2048 Peo in Interest of JD 06-12-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA2048
Arapahoe County District Court No. 23JV242
Honorable Bonnie H. McLean, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of J.D., a Child,

and Concerning A.Y.,

Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE SULLIVAN
Freyre and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 12, 2025

---

Ron Carl, County Attorney, Kiley Schaumleffel, Assistant County Attorney, Aurora, Colorado, for Appellee

Sheena Knight, Guardian Ad Litem

Michael Kovaka, Office of Respondent Parents' Counsel, Littleton, Colorado, for Appellant

¶ 1     In this dependency and neglect proceeding, A.Y. (father) appeals the judgment terminating his parent-child legal relationship with J.D. (the child).  We affirm.

## I.     Background

¶ 2     In July 2023, the Arapahoe County Department of Human Services filed a petition in dependency and neglect regarding the then-newborn child.  The Department alleged that mother had tested positive for methamphetamine and fentanyl at the time of delivery and that the child was experiencing withdrawal symptoms.  Mother had left the hospital against medical advice, and father hadn't been to the hospital to see the child.  The Department also noted that the parents were respondents in an open dependency and neglect case involving the child's older sibling.

¶ 3     Father requested genetic testing, which wasn't completed until approximately ten months into the case.  The testing confirmed that he was the child's biological father, and the juvenile court adjudicated him the legal parent of the child.  In May 2024, father entered an admission to specified allegations in the petition and the juvenile court adjudicated the child dependent or neglected.  On the same day, the court adopted a treatment plan that required father

to cooperate with the Department; engage in substance abuse and mental health treatment; develop financial stability; obtain stable housing; comply with the requirements of his pending criminal case; develop protective parenting skills; and attend family time with the child.

¶ 4 Approximately three months later, the Department moved to terminate father's parental rights. The juvenile court held a contested hearing on November 4, 2024, and ultimately granted the Department's termination motion.

## II. Statutory Criteria and Standard of Review

¶ 5 The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent hasn't complied with an appropriate, court-approved treatment plan or the plan hasn't been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 6 The question of whether a juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. Thus, we review the

court's factual findings for clear error but review de novo its legal conclusions based on those facts. *Id.*

## III.  ICWA

¶ 7      As a preliminary matter, father contends that the juvenile court erred under the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, by failing to inquire at the outset of the termination hearing into whether the child is "an Indian child." § 19-1-126(1)(a)(I)(A), C.R.S. 2024.  Specifically, father contends that, although the court made an ICWA inquiry at an earlier stage of the case and father's counsel said that "there is no Native American ancestry," nothing in the record shows that the court conducted a second inquiry of father after the Department moved to terminate his parental rights.  *See People in Interest of C.A.*, 2017 COA 135, ¶¶ 10, 22 (foster care placement proceedings and termination of parental rights proceedings are separate child custody proceedings under ICWA, and a second inquiry is required during the termination proceeding).

¶ 8      We ordered the parties to provide supplemental briefing that addressed whether there is reason to know that the child is an Indian child through paternal lineage and whether father would be

prepared to present any evidence on this issue on remand.  In their respective supplemental briefs, no party (including father) provided any information suggesting that there is any reason to know that the child is an Indian child, or even that they would assert on remand that there was any such reason to know.  This is consistent with the statement by father's counsel earlier in the case that the child didn't have any "Native American ancestry."

¶ 9     Father's argument that the lack of a second inquiry wasn't harmless is unpersuasive.  He contends that if the juvenile court had properly conducted a second inquiry, then it may have determined that the child was an Indian child and the proceedings would have been governed, in part, by ICWA.  But without any information suggesting that the juvenile court would have had reason to know the child was an Indian child, or even that either party would so assert on remand, this argument is mere speculation.

¶ 10     Under these circumstances, we conclude that the juvenile court's omission of a second inquiry before the termination hearing constitutes harmless error.  *See* C.A.R. 35(c); *cf. People in Interest of A.R.Y.-M.*, 230 P.3d 1259, 1261-62 (Colo. App. 2010) (concluding

that deficiencies in the notice provided to the Native American tribes was harmless).

## IV.    Fit Within a Reasonable Time

¶ 11    Father contends that the juvenile court erred by finding that he couldn't become fit within a reasonable time. We disagree.

### A.    Applicable Law

¶ 12    A parent is unfit if they are unable or unwilling to provide the child reasonable parental care. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 23. "Reasonable parental care requires, at a minimum, that the parent provide nurturing and protection adequate to meet the child's physical, emotional, and mental health needs." *S.R.N.J-S.*, ¶ 9. A parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs and, therefore, may also be considered in determining unfitness." *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

¶ 13    A parent must have a reasonable amount of time to comply with a treatment plan before the juvenile court terminates their parental rights. *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App. 2007). What constitutes a reasonable time to comply is necessarily fact specific and may vary from case to case. *Id.* But a

reasonable time isn't an indefinite time; it must be determined by considering the physical, mental, and emotional conditions and needs of the child. *S.Z.S.*, ¶ 24; *see also People in Interest of M.T.*, 121 P.3d 309, 313 (Colo. App. 2005) (noting that "periods as short as five to nine months have been held to be sufficient time to comply with a treatment plan").

¶ 14　　In determining whether a parent's conduct or condition is likely to change and whether the parent can become fit within a reasonable time, the juvenile court may consider several factors, including whether any change occurred during the dependency and neglect proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *K.D. v. People*, 139 P.3d 695, 700 (Colo. 2006). When a child is under six years old, the juvenile court must also consider the expedited permanency planning (EPP) provisions, which require that the child be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2024; *see also S.Z.S.*, ¶ 25.

¶ 15　The juvenile court concluded that father couldn't become a fit parent within a reasonable time. The court found that although father had demonstrated "some compliance" with his treatment plan, he exhibited "the same problems addressed in the treatment plan without adequate improvement." The court found that father had prior involvement with the Department and that he was unsuccessful in his previous case. Further, the court considered the EPP provisions, noting that the case had been open for all fifteen months of the child's life. Continuing the case further, the court found, wasn't in the child's best interests based on her "very young age" and therapeutic needs.

¶ 16　The record supports the juvenile court's findings. It shows that by the time of termination, father hadn't successfully resolved the concerns that initially brought his family to the Department's attention. The caseworker testified that the Department was still concerned about father's mental health and, more specifically, his inability to emotionally regulate in difficult situations. Father also hadn't participated in any mental health treatment except for completing the first phase of a substance abuse program that also

7

included some mental health treatment. The caseworker further testified that she didn't believe father had developed financial stability or obtained stable housing because, at the time of the termination hearing, father hadn't updated her about any employment or informed her where he was living.

¶ 17 The Department also harbored concerns about father's substance use, both in this case and his prior dependency and neglect case. For example, father tested positive for cocaine about a month before the termination hearing. A short time later, he revoked the release of information that allowed the caseworker to access his urinalysis test results. The caseworker also testified that father completed the first phase of his substance abuse treatment program but was asked to leave the program for threatening his peers and being aggressive. Father then transitioned to a sober living facility; but when the caseworker spoke to the facility's case manager, she discovered that father hadn't been attending group therapy and that he had tested positive for substances.

¶ 18 The record shows that father's issues with substance use were longstanding. The caseworker testified that the Department had concerns with father's substance use at the beginning of his

previous dependency and neglect case, which the Department opened over two years before the termination hearing in this case. Additionally, the caseworker's report, which was admitted as evidence at the termination hearing, showed that father had been charged with criminal drug offenses as early as 2020.

¶ 19      Finally, the child was fifteen months old at the time of termination and had been out of the home for her entire life. The caseworker estimated that it would take at least six months for father to comply with the requirements of his treatment plan and become fit. In the caseworker's opinion as an expert in casework and child protection, the child's best interests wouldn't be served by keeping the case open and allowing father more time to comply with his treatment plan.

¶ 20      Father nevertheless argues that he didn't have enough time to work on his treatment plan because the juvenile court didn't adopt it until approximately five months before the November 4, 2024, termination hearing.[1] But five months, depending on the case's

---

[1] Although the juvenile court entered its written order adopting the treatment plan on June 17, 2024, the order states it became effective on May 10, 2024 — the date of father's adjudicatory hearing during which the court verbally adopted the plan.

circumstances, may suffice for the parent to comply with the treatment plan. *M.T.*, 121 P.3d at 313. Even if that wasn't the case here, the caseworker testified that father had a court-ordered treatment plan in his other dependency and neglect case when this case first opened. The treatment plan objectives in that case were "very similar" to the objectives in this case; they required father to address substance use and mental health issues. Thus, as noted by the caseworker, father actually had over two years, not just five months, to work on the issues addressed in his treatment plans. Despite that amount of time, the caseworker testified that she continued to have the "same concerns" that existed when the Department prepared father's first treatment plan.

¶ 21    We also reject father's argument that the juvenile court should have allowed more time based on his recent progress. The court acknowledged that father had made "some progress" on his treatment plan, noting that he had engaged in substance abuse and mental health treatment; went to a sober living facility; participated in some family time with the child; and maintained contact with the caseworker. But based on the child's age and needs, the court still found that keeping the case open to allow father more time wasn't

in the child's best interests. *See In re Marriage of Kann*, 2017 COA 94, ¶ 36 ("[O]ur supreme court has . . . expressed unbridled confidence in trial courts to weigh conflicting evidence."); *People in Interest of D.L.C.*, 70 P.3d 584, 588 (Colo. App. 2003) (while a parent need not comply "absolutely" with every treatment plan provision, "partial compliance, or even substantial compliance, may not result in a successful plan that renders the parent fit").

¶ 22    Given all this, we conclude that the juvenile court properly analyzed whether father could become fit within a reasonable time. Because the court's determination is supported by the record, we decline to disturb the judgment.

## V.    Less Drastic Alternatives

¶ 23    Father also contends that the juvenile court erred by determining that there were no less drastic alternatives to termination. We aren't persuaded.

### A.    Applicable Law

¶ 24    A juvenile court must consider and eliminate less drastic alternatives to termination, although it need not make express findings on the issue. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 40. In considering less drastic alternatives, the court must give

11

primary consideration to the child's physical, mental, and emotional conditions and needs. *People in Interest of Z.M.*, 2020 COA 3M, ¶ 29. The court may consider whether an ongoing relationship with a parent would be beneficial to the child. *People in Interest of A.R.*, 2012 COA 195M, ¶ 38. The parent's fitness to care for the child's needs will necessarily influence this determination. *Id.*

¶ 25 For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, the less drastic alternative must be the "best" option for the child. *A.M.*, ¶ 27. Long-term or permanent placement with a family member or foster family, short of termination, may not be a viable less drastic alternative if the placement doesn't provide adequate permanence that adoption would provide or otherwise meet a child's needs. *A.R.*, ¶ 41. If a juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *A.M.*, ¶ 32.

## B. Analysis

¶ 26 The juvenile court found that there were no less drastic alternatives to termination that would be in the child's best

interests. Specifically, the court found that although the Department looked into various family members, it didn't find any who would be an appropriate placement option. And the court categorically rejected any allocation of parental responsibilities (APR) based on the child's young age and her physical, mental, and emotional needs.

¶ 27 The record supports the juvenile court's findings. The caseworker testified that she had explored placement of the child's older sibling with several family members in father's prior dependency and neglect case but had found none. And in this case, she had investigated new family members as well. Despite her efforts, she was unable to identify any relatives who were willing and able to take the child. Further, she opined that an APR wouldn't be appropriate because (1) maintaining an ongoing relationship with father wasn't in the child's best interests and (2) termination was the only way to provide the child with the permanency and stability she needed.

¶ 28 We reject father's argument that the juvenile court erred by finding that an APR to paternal grandmother wasn't a viable less drastic alternative. According to father, the Department didn't

investigate her during the pendency of this case. But the juvenile court found, with record support, that the Department had attempted to conduct a home study for paternal grandmother as part of father's other dependency and neglect case, which was still pending when this case opened. The caseworker testified that paternal grandmother had been unwilling to participate in that home study and that there was no indication that she had changed her mind. As a result, the court found that paternal grandmother's unwillingness to do "any work on [the home study] or placement . . . [was] sufficient . . . to find that [she was] not an appropriate less drastic alternative."

¶ 29    In addition, even assuming that paternal grandmother was willing and able to take the child, the court's categorical rejection of an APR to any family member was still supported by the caseworker's testimony that any move would be detrimental to the child. *See A.M.,* ¶ 27; *A.R.,* ¶ 41.

¶ 30    Accordingly, because the record supports the juvenile court's finding that there were no viable less drastic alternatives to termination, we won't disturb the judgment. *See People in Interest of B.H.,* 2021 CO 39, ¶ 80.

## VI. Disposition

¶ 31    We affirm the judgment.

JUDGE FREYRE and JUDGE SCHOCK concur.