25CA0989 Peo in Interest of KB 12-04-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0989
Larimer County District Court No. 23JV30110
Honorable Ann Gail Meinster, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of K.B., A.B., and H.B., Children,

and Concerning H.B.,

Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Brown and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 4, 2025

---

Bill Ressue, County Attorney, Jennifer A. Stewart, Assistant County Attorney II, Fort Collins, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Patric R. Henson, Office of Respondent Parents' Counsel, Justin Twardowski, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1    In this dependency or neglect action, H.B. (father) appeals the judgment terminating his parent-child legal relationships with K.B., A.B., and H.B. (the children).

## I.    Background

¶ 2    In August 2023, the Larimer County Department of Human Services (the Department) filed a petition in dependency or neglect after receiving reports that there was substance abuse and domestic violence in the family home.  Father admitted to the allegations in the petition and agreed to a deferred adjudication.

¶ 3    As a condition of the deferred adjudication, father agreed to complete family treatment court.  Approximately three months after he started family treatment court, father was discharged from the program.  The juvenile court subsequently adjudicated the children dependent or neglected and adopted a treatment plan for father.

¶ 4    Later, the Department moved to terminate father's parental rights.  In January and February 2025, the court conducted a multi-day evidentiary hearing on the motion.  At the hearing's conclusion, the court granted the motion and terminated father's parental rights.

## II.    Termination Criteria and Standard of Review

¶ 5      A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan, or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time.  § 19-3-604(1)(c), C.R.S. 2025.

¶ 6      Whether a juvenile court properly terminated parental rights is a mixed question of law and fact because it involves the application of the termination statute to evidentiary facts.  *People in Interest of L.M.*, 2018 COA 57M, ¶ 17.  We review the court's factual findings for clear error, but we review de novo its legal conclusions based on those facts.  *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.  We review de novo the juvenile court's ultimate determination of whether the Department satisfied its reasonable efforts obligation. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.  The credibility of the witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn therefrom are

within the discretion of the juvenile court.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.

## III.   Discussion

### A.   Reasonable Efforts

¶ 7     Father asserts that the juvenile court erred by finding that the Department provided reasonable efforts to rehabilitate him and reunify him with the children.  We are not persuaded.

#### 1.   Applicable Law

¶ 8     A human services department must make reasonable efforts to rehabilitate parents and reunite families following out-of-home placement of abused or neglected children.  §§ 19-1-103(114), 19-3-100.5, 19-3-604(2)(h), C.R.S. 2025.  Reasonable efforts means the "exercise of diligence and care" for a child or youth who is in out-of-home placement, and the reasonable efforts standard is satisfied when services are provided in accordance with section 19-3-208, C.R.S. 2025.  § 19-1-103(114).

¶ 9     To evaluate whether a department made reasonable efforts, the juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan.  *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011).  A parent's

incarceration status does not excuse a department from making reasonable efforts. *See* § 19-3-508(1)(e), C.R.S. 2025. But a department has "discretion to prioritize certain services or resources to address a family's most pressing needs in a way that will assist the family's overall completion of the treatment plan." *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33. So, whether a department made reasonable efforts "must be measured holistically rather than in isolation with respect to specific treatment plan objectives." *Id.* at ¶ 35.

¶ 10 The parent is ultimately responsible for using the services provided to obtain the assistance needed to comply with the treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). The court may therefore consider a parent's unwillingness to participate in treatment when determining whether a department made reasonable efforts. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12.

2. Analysis

¶ 11 The juvenile court found, with record support, that the Department made reasonable efforts to rehabilitate father and reunify the family. The court further found that "[t]he evidence is

4

essentially uncontroverted that [father] made very little effort to comply and made no significant progress in [his] treatment plan[ ].”

¶ 12    First, we reject father's argument that the Department failed to provide reasonable efforts because it did not arrange for adequate transportation. True, father made known that he had transportation barriers at various times throughout the case. Yet, father did not participate in treatment services even when virtual attendance and transportation options were made available. When father had a working car, the Department also provided gas cards.

¶ 13    The Department moved family time to a location that that was closer to father's substance use treatment facility to ease his transportation barriers related to attending family time and treatment, but he still did not engage. His family time attendance was inconsistent, despite the visitation specialist's offer to drive him to visits when his car was inoperable. Father's urinalysis testing facility was within walking distance of his residence for at least five months of the case, yet he completed only four urinalysis tests, all of which were positive for fentanyl, opiates, and tetrahydrocannabinol. Father also failed to attend treatment classes even when those were available virtually. And the

5

caseworker further testified that she "never really got to the point of figuring out *how* to get [father] to treatment, because [he] never followed through with the process of enrolling." (Emphasis added).

¶ 14 Next, we disagree with father's assertion that he was not able to participate in his treatment plan because the Department failed to provide him with a phone or internet services. As father contends, the record shows he did not have consistent access to a working phone or internet services at various points throughout the case. Father points to no legal authority, and we are aware of none, that would specifically require the Department to provide a phone or internet services. Nevertheless, the record shows that the caseworker tried to help father access a phone and internet.

¶ 15 The caseworker testified that she asked the Department to authorize a phone for father. The caseworker also provided him with community resources to get a new phone and reported that he would be able to access the internet at the local library. Father also reported that he was able to go to a nearby restaurant to use their internet. Father's behavioral health service program also had telehealth offices at all of their outpatient locations available to

individuals who did not have access to a cell phone. The record does not reflect that father ever took advantage of these resources.

¶ 16     Additionally, the record shows that father's lack of engagement in treatment did not appear to be related to his lack of phone or internet access. The caseworker testified that father was difficult to contact even when he had a working phone. The family time supervisor reported that, as far as she knew, it seemed father had consistent access to reliable internet because he was "always really good at confirming visits." And the caseworker did not believe offering him a phone would have helped improve his engagement, as it appeared there was typically at least one adult with a phone available in the home.

¶ 17     Lastly, father argues that the Department failed to comply with section 19-3-508(1)(e)(III), by failing to detail the services and treatment available to him while he was incarcerated. The Department concedes that they did not strictly comply with the statute. Nevertheless, the Department and guardian ad litem contend, and the record demonstrates, that the error was harmless and strict compliance with the statute would not have affected the overall outcome of the case.

¶ 18    As relevant here, section 19-3-508 provides that, if, after disposition is entered, a parent becomes continuously incarcerated for more than thirty-five days, "the caseworker assigned to the case, upon knowledge of incarceration," shall provide information at the next scheduled hearing detailing either (1) "the services and treatment available to a parent at the facility or jail where the parent is incarcerated" or (2) "the caseworker's efforts to obtain the information." § 19-3-508(1)(e)(III).

¶ 19    Father was incarcerated in September 2024, after reportedly making threatening statements towards various professionals involved in the case during a family time visit. As a result of the criminal case stemming from those threats, and another unrelated case, father was sentenced to five years in community corrections. He was released from custody to community corrections in January 2025.

¶ 20    Father contends that the caseworker did not provide information detailing the services and treatment available to father at the facility where he was incarcerated, nor did she report her efforts to obtain such information at any court hearing. This is contrary to the statutory provisions. *See id.*

¶ 21 The record shows that the caseworker attempted to learn what services were available to father but was ultimately limited by the length of his incarceration and his refusal to meet with her without his attorney present. The caseworker learned that individuals had access to services at the facility where father was incarcerated, but the inmate had to request the services. The caseworker attempted to meet with father to discuss available services in October and November 2024, but he declined to meet without his attorney and parent advocate present.

¶ 22 Father did meet with the caseworker in December 2024, roughly two weeks before he was released from custody, despite his attorney and parent advocate's unavailability. At that meeting, the caseworker asked father if he had taken any classes while incarcerated; he reported he would tell her "later." While father provided evidence during the termination hearing about the services he accessed while incarcerated, the caseworker reported that father did not provide that information to the Department before the termination hearing.

¶ 23 Lastly, father asserts that he "never received a hard copy of his treatment plan" and therefore "did not know its objectives," and, as

a result, his ability to engage with his treatment plan was delayed. The caseworker admitted that she did not give father a copy of the treatment plan while he was incarcerated. We acknowledge that it would be best practice for a caseworker to provide parents with copies of their treatment plan. But father has not directed us to any legal authority that requires it. And because father was represented by counsel while he was incarcerated, he could have acquired the treatment plan from counsel. Even still, the record shows father was able to access services while incarcerated, and at the termination hearing, he testified that he was enrolled in and completed various services.

¶ 24    Based on this record, we conclude that the Department made reasonable efforts and any noncompliance with section 19-3-508(1)(e)(III) was harmless. Therefore, we will not disturb the court's factual findings and legal conclusions.

### B.    Appropriate Treatment Plan

¶ 25    Father contends that the juvenile court erred in finding that his treatment plan was appropriate. We disagree.

### 1. Applicable Law

¶ 26 The purpose of a treatment plan is to preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required intervention in the family. *L.M.*, ¶ 25. Therefore, an appropriate treatment plan is one that is approved by the court, relates to the child's needs and provides treatment objectives that are reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time. § 19-1-103(12), C.R.S. 2025; *People in Interest of K.B.*, 2016 COA 21, ¶ 13. A juvenile court abuses its discretion in formulating a treatment plan when its actions are manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding or application of the law. *People in Interest of M.W.*, 2022 COA 72, ¶¶ 12, 32.

¶ 27 That a treatment plan is not ultimately successful does not mean that it was inappropriate when the court approved it. *People in Interest of M.M.*, 726 P.2d 1108, 1121 (Colo. 1986).

### 2. Analysis

¶ 28 The juvenile court adopted father's treatment plan in April 2024. Father did not object to the proposed treatment plan. The

11

plan required him to (1) participate in an integrated assessment to address any safety, substance abuse, or mental health concerns; (2) communicate and cooperate with the Department; (3) participate in a trauma impact parenting course; and (4) maintain a bond and attachment with the children through participating in family time. The juvenile court found that the treatment plan was appropriate, and the record supports those findings.

¶ 29     We measure the appropriateness of a treatment plan by its likelihood of success in reuniting the family, "which must be assessed in light of the facts existing *at the time of the plan's approval.*" *People in Interest of B.C.*, 122 P.3d 1067, 1071 (Colo. App. 2005) (emphasis added). We note that father has not contested any of the objectives in his treatment plan or asserted that the treatment plan should have included additional components, either at the time of its approval or after his incarceration. Put another way, it is undisputed that father needed to address these four areas for him to become a fit parent.

¶ 30     To the extent that father argues the Department should have revisited the treatment plan after his incarceration, the record shows that the Department *did* consider writing a new treatment

12

plan but declined after determining that the elements of his treatment plan would not have changed. Moreover, father fails to describe any additional services or treatment plan modifications that would have been necessary for his success during his incarceration.

¶ 31 Thus, we discern no error in the court's findings that father's treatment plan was appropriate.

## IV. Disposition

¶ 32 The judgment is affirmed.

JUDGE BROWN and JUDGE MEIRINK concur.