25CA1281 Peo in Interest of J-TM 03-12-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA1281
Weld County District Court No. 22JV29
Honorable Troy Hause, Judge

The People of the State of Colorado,

Appellee,

In the Interest of J-T.M., a Child,

and Concerning E.P.,

Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHUTZ
Freyre and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 12, 2026

Bruce T. Barker, County Attorney, David S. Anderson, Assistant County Attorney, Greeley, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant

¶ 1        In this dependency or neglect proceeding, E.P. (mother)

appeals the judgment terminating her parent-child legal

relationship with J-T.M. (the child).  We affirm.

## I.        Background

¶ 2        The Weld County Department of Human Services (Department)

initiated an action in dependency or neglect based on concerns

related to mother's financial and housing instability, mental health,

and medical neglect of the child.  The juvenile court adjudicated the

child dependent or neglected and adopted a treatment plan for

mother.

¶ 3        Mother appealed, and a division of this court reversed the

adjudication judgment based on the juvenile court's failure to

properly determine whether it had jurisdiction over the matter.

*People in Interest of J-T.M.*, (Colo. App. No. 22CA2242, Sep. 7, 2023)

(not published pursuant to C.A.R. 35(e)).  After a remand, the

juvenile court determined it had jurisdiction, reinstated the

adjudication, and readopted mother's treatment plan.  Mother

appealed the reinstated adjudication, which was upheld on appeal

by another division of this court in *People in Interest of J-T.M.*, (Colo.

App. No. 24CA150, Sep. 12, 2024) (not published pursuant to C.A.R. 35(e)).

¶ 4 Later, the Department moved to terminate mother's parental rights. Following an evidentiary hearing, the juvenile court granted the termination motion.

## II.    Criteria for Termination and Standard of Review

¶ 5 A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent or neglected; (2) the parent hasn't reasonably complied with an appropriate treatment plan or the plan hasn't been successful in rendering the parent fit; (3) the parent remains unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 6 When, as here, a child is under six years old at the time a petition in dependency or neglect is filed, the juvenile court must place the child in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025; *see People in Interest of S.Z.S.*, 2022 COA 133, ¶ 25.

¶ 7 Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves

application of the termination statute to evidentiary facts. *People in Interest of L.M.*, 2018 COA 57M, ¶ 17. We review the court's factual findings for clear error, but we review de novo its legal conclusions, including whether the department satisfied its reasonable efforts obligation. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10; *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. The credibility of the witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions to be drawn therefrom are within the discretion of the juvenile court. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.

### III.  Reasonable Efforts

¶ 8     Mother contends that the juvenile court erred by finding that the Department fulfilled its duty to provide reasonable efforts. Specifically, she asserts that (1) her in-person family time was erroneously suspended; (2) the length of the suspension was unreasonable; and (3) in-person family time should have been held in Colorado. We consider, and reject, each contention below.

### A.  Preservation

¶ 9     The guardian ad litem argues that, although mother preserved a reasonable efforts argument generally, she did not preserve the

specific arguments she now asserts on appeal. We need not decide this issue because, even if we assume mother preserved her claim, we discern no reversible error.

## B. Applicable Law

¶ 10    To determine whether a parent is unfit, the juvenile court must consider whether the department of human services made reasonable efforts to rehabilitate the parent and reunite the family. *See* §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2025; *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). Reasonable efforts means the "exercise of diligence and care" for a child who is in out-of-home placement, and the reasonable efforts standard is satisfied if appropriate services are provided to a parent in accordance with section 19-3-208, C.R.S. 2025. § 19-1-103(114), C.R.S. 2025. Under that statute, family time is among the services that "must be available and provided" as determined necessary and appropriate by individual case plans. § 19-3-208(1), (2)(b)(IV); *People in Interest of B.C.*, 122 P.3d 1067, 1070 (Colo. App. 2005).

¶ 11    In determining whether family time services are necessary and appropriate, the health and safety of the child are paramount. *See B.C.*, 122 P.3d at 1070. Family time services should further the

4

purposes of the Children's Code, including the preservation of familial ties whenever possible. § 19-1-102(1)(b). However, family time services may be denied or limited if the court finds "that visitation with the parent would be detrimental to the health and safety of the child." *People in Interest of E.S.*, 2021 COA 79, ¶ 23.

¶ 12 To evaluate whether a department made reasonable efforts, the juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan. *S.N-V.*, 300 P.3d at 915. The parent is ultimately responsible for using the services provided to obtain the assistance needed to comply with the treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). The court may therefore consider a parent's unwillingness to participate in services when determining whether a department made reasonable efforts. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12.

## C. Additional Background

¶ 13 Following the child's removal from the home, the juvenile court ordered regular weekly supervised family time. To that end, the Department set up in-person supervised visits, and mother attended regularly.

¶ 14     During family time, mother routinely inspected the child's body (including the child's genitals) and would show pictures of the child's face and body to professionals involved in the case, asserting there were visible injuries on the child. The professionals did not see the injuries mother purported to see.

¶ 15     Roughly four months after supervised family time began, mother again alleged there were injuries on the child and that he was being sexually abused. None of the professionals were able to see the injuries she reported.

¶ 16     Mother then called law enforcement and paramedics and requested the child be taken to the hospital. At the hospital, mother asked that a sexual assault nurse examiner conduct an exam of the child. Over the Department's objections, the hospital performed the exam. Medical professionals determined there were no concerns about physical or sexual abuse. Mother did not accept this determination and stated that she would seek a second opinion.

¶ 17     Following the incident, the Department requested and was granted a protection order suspending in-person family time. The court paused all family time for two weeks before allowing it to

resume with therapeutically supervised virtual visits. After a brief delay, during which the family time provider waited for mother to sign necessary paperwork, virtual visits began and remained available for almost two years.

¶ 18     While family time was virtual, mother left Colorado and gave birth to another child. Mother first moved to Missouri, then Florida, before settling in Michigan for the remainder of the case.

¶ 19     The child was also moved to New Mexico where he was placed with his maternal great grandmother. Virtual family time continued in the interim.

¶ 20     Later, mother requested and was granted the reinstatement of supervised in-person family time. Virtual family time remained in place for the balance of the case.

¶ 21     The Department scheduled in-person family time for mother in New Mexico, where the child resided. Initially, a caseworker from the Department of Human Services in New Mexico supervised the visits. The Department covered the cost of mother's and her younger child's travel to and from Michigan.

¶ 22     When the New Mexico caseworker was no longer able to supervise visits, family time was transitioned to another provider in

7

New Mexico. That provider later reported that mother could not bring the younger sibling to family time following an incident in which the sibling was reportedly injured. The provider was willing to continue supervising family time between mother and the child, but mother refused to work with the provider if the sibling was not allowed to attend.

¶ 23 The caseworker investigated additional family time providers in New Mexico and nearby in Texas but was unable to coordinate another provider who could provide adequate supervision levels while allowing the child's sibling to attend. Given mother's refusal to work with the original supervisor, and the lack of an available provider who could accommodate the younger sibling, family time returned to a virtual setting.

¶ 24 In between the days of the termination hearing, one in-person family time session was held in Colorado.

### D. Analysis

#### 1. Suspension of In-Person Family Time

¶ 25 First, mother appears to contend that the court erroneously suspended in-person family time, not due to legitimate safety

concerns but because "the Department felt that [m]other was too assertive" in examining the child during family time visits.

¶ 26    The court found that the child's health and safety required suspension of family time. *See* § 19-3-217(1.5)(d), C.R.S. 2025 (a court may "restrict or deny family time if it is necessary to protect the child's or youth's safety or mental, emotional, or physical health"). Specifically, the court believed that in-person family time allowed mother "access to the child in a way that is unsafe," while virtual family time would "keep the connection between mother and [the] child going" in a way that limited safety concerns.

¶ 27    The record supports the court's findings:

- The visit supervisor reported mother had previously taken pictures of the child's genitals looking for evidence of sexual abuse. She noted that mother indicated she would continue to undress and search the child at every visit if she continued to have concerns.

- The caseworker expressed that there had been ongoing concerns about mother's escalated behavior leading to the incident that ended with the child being examined for sexual abuse. The caseworker described the child as

being distraught after the exam and that it was difficult to calm him down.

- The caseworker's supervisor explained that mother did not understand how traumatizing invasive medical exams could be for the child. He further believed continuing in-person family time could be "emotionally or psychologically endangering" to the child and that the continuation of in-person visits could expose the child to additional trauma.

- Mother testified that if she continued to have safety concerns about the child, she would report her concerns to law enforcement "the same way" that she did during the incident.

¶ 28 Given this evidence, we conclude that the juvenile court suspended family time based on legitimate concerns for the child's emotional health and safety.

### 2. Reinstatement of In-Person Family Time

¶ 29 Mother also argues that even if the suspension of in-person family time was necessary, the length of the suspension — about twenty months — was unreasonable.

¶ 30   We acknowledge that mother's in-person family time was suspended by the court for nearly two years.  And the record shows that, for six months of that time, mother was engaged in her treatment plan and received positive reports on her progress.

¶ 31   However, some concerns remained.  The virtual family time provider testified that, while mother attended consistently, virtual family time was "very unpredictable," and mother struggled with her emotions, boundaries, and inappropriate conversations with the child.  Because of this, the virtual family time provider opined that she would not recommend a less restrictive family time setting.  The caseworker also noted that mother's mental health needed to be further addressed to alleviate concerns over in-person family time.  Regardless, because mother's in-person family time was ultimately reinstated well before termination, we need not determine whether the length of the suspension was reasonable.

¶ 32   Still, mother argues that a second discontinuation of in-person visits amounted to a "*de facto* suspension" that was caused by the Department's lack of reasonable efforts.

¶ 33   To be clear, the record indicates there was only *one* court-ordered suspension of in-person family time, as described above,

and the second disruption of in-person family time occurred only after mother refused to attend when the provider would not allow the child's younger sibling to attend the sessions. The family time provider was willing to continue supervising in person family time; but mother declined to attend the sessions. The caseworker attempted to problem-solve with mother to arrange for alternative childcare for the younger child while she was in family time, but mother refused to consider any alternatives. Thus, it was mother's choice to stop attending in-person family time, and not the Department's lack of efforts or a court order, that prevented in-person family time from continuing. *See A.V.,* ¶ 12.

### 3. Location of In-Person Family Time

¶ 34 Next, we reject mother's argument that the Department should have held in-person family time in Colorado, even though neither she nor the child resided there.

¶ 35 The juvenile court found that the Department made reasonable efforts to provide mother with in-person family time in New Mexico. The court found that "it was not in the child's best interest" to be regularly transported to Colorado for family time, and

12

it "was not a reasonable accommodation under the circumstances." The court's conclusion is supported by the record.

¶ 36 The caseworker reported that the child missed some of his weekly therapy appointments and a few days of school due to the difficulties in coordinating schedules for flights to and from Colorado. The caseworker also testified that a family time visit in Colorado cost the department over $4,000, and that expense was not something the Department could provide on an ongoing basis.

¶ 37 Accordingly, because the record supports the juvenile court's findings and conclusion that the Department made reasonable efforts with respect to family time, we discern no error.

IV. Fitness Determination and Substantial Compliance

¶ 38 Mother next argues that the court erred by finding that she was unfit because she made substantial progress during the case. In the alternative, mother contends that, based on her progress, the court erred by finding she could not become fit within a reasonable period of time. We are not persuaded.

A. Applicable Law

¶ 39 A parent is unfit if she is unable or unwilling to provide her child reasonable care due to her conduct or condition. *S.Z.S.*, ¶ 23.

13

"Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental needs and conditions." *Id.*

¶ 40 In determining whether a parent's fitness is likely to change within a reasonable period of time, the court may consider "whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition." *Id.* at ¶ 24. A "reasonable time" must be determined by "considering the child's physical, mental, and emotional conditions and needs" and is a fact-specific inquiry varying from case to case. *Id.* at ¶ 25 (citing *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006)).

### B. Analysis

¶ 41 Mother's treatment plan required her to, among other things, address her mental health, develop additional parenting skills to meet the child's needs, attend all family time, and obtain and maintain suitable stable housing and employment.

¶ 42 The court found that mother "complied partially" with her treatment plan, but that "there has not been substantial

14

compliance and [the treatment plan] clearly has not been successful in returning the child home." Specifically, it found that her unaddressed mental health concerns were "of such duration or nature as to render her unlikely, within a reasonable period of time, to care for" the child's needs and that she was unfit. This finding is supported by the record.

¶ 43 The caseworker testified that mother was "partially" compliant with the mental health component of her treatment plan. The caseworker noted that mother had completed a psychological evaluation and had engaged in mental health services for roughly six months. She further reported that mother received "really positive" reports and worked well with the Department.

¶ 44 However, after mother was discharged from mental health services at her own request, the caseworker saw a notable increase in mother's paranoia, including allegations that the child was being abused, and accusations that professionals and family members were working against her. The caseworker repeatedly attempted to reengage mother in services, but mother believed she had completed the mental health component of her treatment plan and would not reengage or discuss her mental health further.

¶ 45    An expert in the field of psychology opined that mother "had very significant mental health needs" and met the criteria for a delusional disorder and a paranoid personality disorder.  He believed that mother's "mistrust of and lack of other social supports" makes parenting a child "very difficult" and "leaves her very vulnerable and puts her and her son at risk."  He testified that mother would need to be in counseling for "many, many months, if not years," to adequately address her mental health needs.  The court found this testimony credible.

¶ 46    While the record shows mother consistently attended family time, the caseworker reported concerns that she was not willing to follow the recommendations provided by family time supervisors.  And the family time supervisor testified that she would not recommend lowering the visit supervision level because she believed mother would engage in inappropriate conversations with the child or be unable to regulate her emotions.

¶ 47    Additionally, despite mother testifying that she had stable housing and employment, the Department was never able to verify her claims.  While mother provided several home addresses throughout the case, she was not always willing to provide

information about where she was living and at times gave contradictory information. Similarly, while mother reported she was consistently employed, financially successful, and later provided a bank statement as proof, the caseworker was unable to verify her income because the report was heavily redacted.

¶ 48 Ultimately, the caseworker opined that mother was not fit and that she was not willing to work on the concerns that led to the filing of the case. The caseworker did not believe mother would be able to make the necessary changes to become a fit parent in a reasonable amount of time.

¶ 49 Mother points us to aspects of her treatment plan compliance and an approved Interstate Compact on the Placement of Children home study as proof she could become fit within a reasonable period of time. Although the record supports aspects of mother's assertions, the court considered that evidence, weighed it against the contrary evidence described above, and concluded that mother is unfit. Additionally, the case had been open for over three years, and mother had significant treatment areas that she needed to address to become fit. Under these circumstances, mother's compliance with the treatment plan was not sufficient to render her

fit, *see People in Interest of T.E.M.*, 124 P.3d 905, 909 (Colo. App. 2005), nor was the juvenile court required to give her more time to become fit, *see S.Z.S.*, ¶ 24.

¶ 50   For these reasons, we conclude that the juvenile court did not err when it found mother was unfit or unable to become fit within a reasonable period of time.

## V.   Less Drastic Alternatives

¶ 51   Mother contends that the juvenile court erred by finding that there was no less drastic alternative to termination.  We disagree.

## A.   Applicable Law

¶ 52   In analyzing less drastic alternatives, the juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs.  *People in Interest of Z.M.*, 2020 COA 3M, ¶ 29.  Long-term or permanent placement with a family member, short of termination, may not be in a child's best interests if it does not meet the child's needs.  *People in Interest of A.R.*, 2012 COA 195M, ¶ 41.  When a juvenile court considers a less drastic alternative but finds that termination is in a child's best interests, we are bound to affirm the court's decision so long as the record supports its findings.  *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

18

## B. Analysis

¶ 53 The juvenile court found that termination of parental rights was in the child's best interests and there were no less drastic alternatives to termination. The court recognized the existing bond between mother and the child and that there would be a negative impact on the child if that bond was severed through termination. Nevertheless, the court did not believe an allocation of parental responsibilities (APR) would "meet the child's best interests on a long term basis."

¶ 54 The record supports the court's findings. The caseworker opined that termination was appropriate because she did not believe mother was able to give the child the stability and permanency he needs. True, the caseworker agreed that mother and the child were bonded and severing that bond would be traumatic for the child. But the caseworker also noted that maternal great grandmother and mother did not have a good relationship. Maternal great grandmother agreed her relationship with mother was "severed" after mother allegedly made false reports of abuse against her. And she testified that she would not support

any contact between mother and the child unless mother addressed her mental health needs.

¶ 55    The caseworker believed termination was in the child's best interest. She further opined that continuing the case would have a greater negative impact on the child than the severed bond.

¶ 56    Mother's arguments do not convince us that the juvenile court's less drastic findings were clearly erroneous. Mother asserts that an APR to the kinship provider was in the child's best interest because (1) an APR would preserve the child's bond with his siblings; (2) maternal great grandmother testified that she would accept an APR if the court ordered one; and (3) as noted, maternal great grandmother reported if mother's rights were terminated she would not support contact between mother and the child unless and until mother addressed her mental health.

¶ 57    A juvenile court can consider these and other factors when deciding if there is a viable less drastic alternative to termination. *See People in Interest of N.D.V.*, 224 P.3d 410, 421 (Colo. App. 2009) (considering similar factors); *see also A.R.*, ¶ 38 (noting that the court "may consider various factors" in its analysis of less drastic alternatives). In this case, the court considered, and rejected, an

APR based on mother's unfitness, mother's volatile relationship with maternal great grandmother, and the child's need for permanency. It is not our place to reweigh the evidence or substitute our judgment to reach a different conclusion. *See S.Z.S.*, ¶ 29. And because the record supports the court's less drastic alternatives finding, we are bound to affirm it. *See B.H.*, ¶ 80.

## VI.  Disposition

¶ 58    The district court's judgment is affirmed.

JUDGE FREYRE and JUDGE BROWN concur.